Deborah WILSON, Plaintiff,

v.

WALGREEN INCOME PROTECTION PLAN FOR PHARMACISTS AND REGISTERED NURSES, WAL-GREEN CO., and Sedgwick Claims Management Services, Inc., Defendants.

Case No. 6:12–cv–0047–Orl–19DAB.

United States District Court,
M.D. Florida,
Orlando Division.

April 29, 2013.

John V. Tucker, Tucker & Ludin, PA, Clearwater, FL, for Plaintiff.

Gregory Alan Hearing, Jeffery L. Patenaude, Sacha Dyson, Thompson, Sizemore, Gonzalez & Hearing, PA, Tampa, FL, for Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

PATRICIA C. FAWSETT, District Judge.

This matter was considered by the Court in a bench trial held on April 8, 2013 (Doc. No. 67), as well as on the submission of the Administrative Record (Joint Exhibit 1; Doc. No. 40-1–40-10), the Joint Final Pretrial Statement (Doc. No. 53, jointly filed by the parties on Mar. 6, 2013), and the parties' respective Trial Briefs (Doc. No. 58, filed by Plaintiff Deborah Wilson on Mar. 13, 2013; Doc. No. 57, filed by Defendants Sedgwick Claims Management Services, Inc., Walgreen Income Protection Plan for Pharmacists and Registered Nurses, and Walgreen Co. on Mar. 12, 2013). Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law. Judgment will be entered for the Plaintiff and against Defendants.

FINDINGS OF FACT

### I. The Procedural History

#### A. The Pleadings

█ This action was brought by Plaintiff Deborah Wilson ("Plaintiff") pursuant to the Employment Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA") against the Defendants Sedgwick Claims Management Services, Inc. ("Sedgwick"), Walgreen Income Protection Plan for Pharmacists and Registered Nurses (the "WIPPPRN"), and Walgreen Co. ("Walgreen")[1] (collectively, "Defendants"). (Doc. No. 1; Doc. No. 21 ¶¶ 1–4, 8, 11–18; Doc. No. 40 at 3.) Alleging that Defendants violated ERISA by depriving

---

1. Throughout the administrative record and the submissions to the Court, Walgreen is spelled alternatively as "Walgreens." The Court will refer to Walgreen as it has been named in this action—in the singular; however, in this Order, the Court has not corrected or otherwise noted the parties' respective references to Walgreens.

her of long-term disability ("LTD") benefits to which she was entitled under the Income Protection Plan for Pharmacists and Registered Nurses (the "IPPPRN"), Plaintiff requests that this Court enter judgment in her favor and against Defendants as follows:

(a) [declare that] Plaintiff is entitled to [LTD] benefits from April 8, 2011 through the date of the filing of this lawsuit [January 12, 2012]; and

(b) [a]ward benefits in the amount not paid to Plaintiff from April 8, 2011 to the date of filing this lawsuit [January 12, 2012]—a total of **$26,316.00**, together with prejudgment interest on each monthly payment from the date it became due until the date it is paid; and

(c) [a]ward reasonable attorney fees and costs incurred in this action; and

(d) [award] such other further relief as this court deems just and proper, including but not limited to . . . remanding Plaintiff's claim to the Plan Administrator for further action to address continuing benefits after the final date of benefits awarded by this Court. . . . [2]

(Doc No. 1 ¶ 28 (emphasis in original, footnote added).) On February 28, 2012, Defendants jointly filed their Answer and Defenses. (Doc. No. 21.)

## B. The Parties' Pre–Trial Filings and the Court's Orders

### 1. Cross–Motions for Summary Judgment and Motion for Reconsideration

In an Order dated February 28, 2013 (the "February Order"), on cross-motions for summary judgment [3], the Court ruled that Sedgwick's final determination was wrong under a *de novo* review and that Plaintiff met her burden to establish that she was "disabled" through at least May 11, 2011. (Doc. No. 49.) Nonetheless, the Court denied the parties' cross-motions for summary judgment because questions of fact existed as to whether the grant of discretion to Sedgwick under a Summary Plan Description for the IPPPRN (the "SPD") was effective to entitle Defendants to a review of Sedgwick's resolution of Plaintiff's LTD claim under a deferential standard of review. (*Id.*) To resolve this issue, the Court set the matter for a bench trial in the April 2013 trial term. (*Id.*) In an Order dated March 21, 2013 (the "March Order"), the Court denied the Defendants' Motion for Reconsideration and affirmed its February Order. (Doc. No. 61.) [4] Specifically, the Court held that judgment was properly denied pending receipt at the bench trial of either: (1) the entirety of the documents comprising the IPPPRN (properly authenticated), or (2) admissible evidence establishing that the

---

**2.** If a district court reverses a plan administrator's decision, it should remand to the administrator for a new determination of benefits. *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir.1989).

**3.** On December 3, 2012, Plaintiff filed her Motion for Summary Judgment ("Plaintiff's Motion") (Doc. No. 41), and Defendants filed their cross-motion for Summary Judgment ("Defendants' Motion") (Doc. No. 40). Defendants filed their Response in Opposition to Plaintiff's Motion on December 26, 2012.

(Doc. No. 45.) Plaintiff filed her Response in Opposition to Defendants' Motion on January 17, 2013. (Doc. No. 46.) Finally, Defendants filed their Reply in Support of Defendants' Motion on February 4, 2013. (Doc. No. 47, filed Feb. 4, 2013.)

**4.** On March 6, 2013, Defendants filed a Motion for Reconsideration. (Doc. No. 51.) On March 15, 2013, Plaintiff filed her Memorandum of Law in Opposition to the Motion for Reconsideration. (Doc. No. 60.)

SPD is the only operative document for the IPPPRN. (*Id.* at 5–6.)

## 2. Trial Briefs

In anticipation of the bench trial, the parties filed trial briefs. (Doc. No. 57 ("Defendants' Brief"), and Doc. No. 58 ("Plaintiff's Brief").) In Plaintiff's Brief, she argues that the Court should enter judgment in her favor because: (1) the Court already has determined that Sedgwick's claim determination was *de novo* wrong, and Defendants cannot meet their burden to establish entitlement to review of such claim determination under a deferential standard; and (2) even considered under a deferential standard of review, Sedgwick's claim determination was unreasonable, and Plaintiff has met her burden to establish entitlement to LTD benefits under the IPPPRN. (Doc. No. 58.) In the Defendants' Brief, Defendants argue that the Court should enter judgment in favor or Defendants because: (1) Sedgwick's final claim determination should be reviewed under a deferential standard of review based on language in the SPD; and (2) under a deferential standard of review, Plaintiff cannot meet her burden to establish that Sedgwick's final determination of her LTD claim was unreasonable and that she is entitled to LTD benefits under the IPPPRN. (Doc. No. 57.)

## II. The Bench Trial

The bench trial was conducted on April 8, 2013. (Doc. No. 67), during which the Court heard testimony from two defense witnesses, attorney Timothy McGrory and Cynthia Craig.[5] In addition, nine exhibits were entered into evidence. (*Id.*)

### A. Trial Exhibits

The Defendants submitted the following exhibits, which the Court admitted into evidence without objection from Plaintiff:

(1) a document titled "Delegation of Authority Regarding Employee Welfare Benefit Plans" dated January 16, 2004, and executed by Julian A. Oettinger, as Secretary of Walgreen ("Defendants' Exhibit 1"); and

(2) a document titled "Service Agreement for Administration of a Claims Program" dated July 1, 2004, and executed by Sedgwick and Walgreen (the "Service Agreement"), which included a document titled "Addendum to the Service Agreement" effective July 1, 2010, and executed by Sedgwick and Walgreen (the "Addendum") (collectively, "Defendants' Exhibit 2").

In addition, the parties submitted seven joint exhibits, including: (1) the Administrative Record of Plaintiff's Claim (the "AR") (Joint Exhibit 1, previously filed at Doc. Nos. 40–1–40–10); (2) Walgreen's corporate records concerning income protection plans (Joint Exhibits 2–5, previously filed at Doc. No. 1–1 at 1–7); and (3) Internal Revenue Service ("IRS") Form 5500 for Walgreen's "Income Protection Plan" for the years 2010 and 2011 (the "Form 5500s") (Joint Exhibits 6–7).

### 1. Joint Exhibits 6 and 7

The two Form 5500s indicate that the "name" of the "plan" is "Income Protection Plan." (Joint Exhibits 6–7.) Further, the "effective date" for the "plan" is listed as January 1, 1993. (*Id.*) Finally, the Form 5500s indicate that the plan "funding" and "benefit" arrangements are the "general assets of the sponsor" as opposed to insurance, insurance contracts, or a trust. (*Id.*) The "plan sponsor" is identified in the Form 5500s as "Walgreen Company." (*Id.*)

---

**5.** Ms. Craig also submitted a Declaration in support of Defendants' Motion. (Doc. No.

40–1; Doc. No. 61 at 5–6 & n. 2 (discussing Ms. Craig's Declaration).)

### 2. Joint Exhibits 2 through 5

Joint Exhibits 2 through 5 are titled and dated as follows:

(a) "Resolution of the Board of Directors Walgreen Income Protection Plan" dated January 29, 1993 (Joint Exhibit 2);

(b) "Walgreen Income Protection Plan for Managers and Professionals" dated October 4, 1993 (Joint Exhibit 3);

(c) "Amendment of Walgreen Co. Welfare Plans" dated April 13, 2000 (Joint Exhibit 4); and

(d) "Resolution Regarding Employee Welfare Benefit Plans" dated July 12, 2000 (Joint Exhibit 5).

Walgreen's corporate representative, Mr. McGrory, testified that Joint Exhibits 2 and 3 do not relate to the IPPPRN, and he was unsure whether Joint Exhibits 4 and 5 relate to the IPPPRN.

### 3. Joint Exhibit 1, The Administrative Record (the "AR")

The parties submitted the Administrative Record as Joint Exhibit 1. The Court will cite to the AR by its numbered pages, "AR000001–AR000484." In summary, the AR is comprised of the following:

(a) Documents related to Plaintiff's claim for short term disability ("STD") benefits, including:

(1) the notes of Sedgwick's case managers for Plaintiff's STD claim (AR000003–27);

(2) correspondence dated March 1, 2010 from Sedgwick to Plaintiff: (a) acknowledging receipt of Plaintiff's "request for disability benefits," (b) advising that Walgreen "is sending" Plaintiff a copy of the SPD, which "contains all of the provisions about how benefits are determined and how you can qualify for them," and (c) providing copies of a medical release form and "Instructions to the Physician" for Plaintiff to provide to her doctor (AR000030–41);

(3) authorization forms for "Release of Protected Health Information" executed by Plaintiff (AR000046, AR000049), and an "Agreement for Recovery of Overpayment of Benefits Under the Walgreen's Disability Plan" executed by Plaintiff on March 5, 2010 (AR000047);

(4) requests from Sedgwick to Hani H. El Kommos, M.D. ("Dr. Kommos") for information and "medical documentation (office visit notes, exam results, etc.)" related to Plaintiff (AR000042–44, AR000084);

(5) treatment notes of Dr. Kommos for the following dates: (a) March 24, 2008 and February 25, 2010 (AR000045, AR00051), (b) March 4, 2010 (AR000057, AR000063), (c) April 1, 2010 (AR000073–74, AR000077–79), (d) May 13, 2010, May 18, 2010, and May 24, 2010 (AR000089–92), (e) June 3, 2010 (AR000097), and (f) July 28, 2010 (AR000101);

(6) a treatment form from Dr. Kommos dated March 4, 2010, indicating that Plaintiff should not work until her "next evaluation" on April 1, 2010 (AR000048);

(7) a facsimile dated March 11, 2010 from Dr. Kommos' office to Sedgwick regarding the extension of Plaintiff's "disability status" to April 1, 2010 and providing treatment notes (AR000054), and a facsimile dated March 12, 2010 from Plaintiff to Sedgwick regarding the same (AR000064–68);

(8) a facsimile dated April 2, 2010, from Plaintiff to Sedgwick providing a treatment form from Dr. Kommos and office notes indicating that Plaintiff cannot work for two

months from April 1, 2010 (AR000072–74);

(9) a facsimile dated April 6, 2010 from Dr. Kommos' office to Sedgwick regarding the extension of Plaintiff's disability status for three months from April 9, 2010 (AR000075–79);

(10) a facsimile dated March 27, 2010 from Dr. Kommos' office to Sedgwick stating that Plaintiff will be unable to work "for approx. 6 months from [her] surgery date 5/14/2010" and her "disability status" should be extended from June 11, 2010 through November 15, 2010 "or longer to be determined" together with notes of Plaintiff's surgical procedures, summary office notes, and a hospital discharge summary (AR000085–86, AR000088–92);

(11) facsimiles from Dr. Kommos to Sedgwick providing various treatment notes from June 3, 2010 (AR000096–98, AR000100–101);

(12) a completed form provided by Sedgwick to Dr. Kommos concerning the expected duration of Plaintiff's inability to work (AR000099);

(13) a "Physical Capacities Evaluation" dated July 28, 2010 (the "PCE") (AR000102); and

(14) "Walgreen's Disability Benefit Notice(s)" approving disability benefits for the following periods and correspondence to Plaintiff regarding the same: (a) March 4, 2010 through March 12, 2010 (AR000053, AR000060); (b) March 4, 2010 through April 9, 2010 (AR000070, AR000071); (c) March 4, 2010 through June 11, 2010 (AR000081, AR000082, AR000087); (d) March 4, 2010 through July 30, 2010 (AR000094, AR000095); (e) March 4, 2010 through August 23, 2010 (AR000104, AR000106);

(b) Documents related to Plaintiff's claim for LTD benefits, including:

(1) the notes of Sedgwick's case managers for Plaintiff's LTD claim (AR000107–156);

(2) correspondence from Sedgwick to Plaintiff dated August 6, 2010, advising Plaintiff that she may be eligible for LTD benefits and asking her to complete and return enclosed forms (AR000157–164), and informing Plaintiff that Sedgwick approved her "claim for [LTD] benefits" for the period of August 24, 2010 through September 2, 2010 and instructing Plaintiff to apply for "Social Security Disability benefits" (AR000165–166 (the "Initial LTD Approval Letter"));

(3) an "Employee Application for Benefits" and an "Authorization for Claim Evaluation and Administration" executed by Plaintiff and dated August 10, 2010 (AR000167, AR000172–174);

(4) a "Training, Education and Experience Statement" completed and executed by Plaintiff and dated August 10, 2010 (AR000168–170) and Plaintiff's CV (AR000171);

(5) correspondence dated May 27, 2004 to Plaintiff from Thomas H. Magee, M.D. ("Dr. Magee") summarizing findings from the MRI of Plaintiff's lumbosacral spine (AR000320);

(6) treatment notes of Dr. Kommos for the following dates: (a) March 2, 1998 and March 16, 1998 (AR000317), (b) February 10, 2004 (AR000318), (c) May 26, 2004 and May 27, 2004 (AR000319), (d) July 1, 2004 (AR000321), (e) May 18, 2005 and May 25, 2005 (AR000322), (f) September 27, 2006 (AR000323), (g) March 24, 2008 (*id.*), (h) March 4, 2010 and March 11, 2010

(AR000324), (i) April 1, 2010 and May 13, 2010 (AR000325), (j) May 14, 2010 (AR000326), (k) July 28, 2010 (AR000327), (*l*) September 2, 2010 (AR000178, AR000180, AR000327), (m) October 14, 2010 (AR000190), (n) December 2, 2010 (AR000216, AR000328), and (o) January 13, 2013 (AR000258, AR000328);

(7) treatment notes from Stanley Golovac, M.D. ("Dr. Golovac") from February 8, 2011 (AR000261–264);

(8) facsimiles from Plaintiff and Dr. Kommos to Sedgwick providing treatment notes from Dr. Kommos (AR000175–179 (related to an office visit on September 2, 2010), AR000196 and AR000215–216 (related to an office visit on December 2, 2010));

(9) a memo dated September 13, 2010 from Dr. Kommos indicating that Plaintiff would be unable to work for approximately "6–7 months (1 year from surgery dated 5/14/10)" but that Plaintiff "may be able to do a teaching job at community college part time 2–4 hours/day (sitting/sedentary position) in early Spring 2011)" (AR000181);

(10) correspondence from Sedgwick to Plaintiff dated September 15, 2010, advising Plaintiff that she is approved for LTD benefits through October 14, 2010 (AR000183);

(11) correspondence from Dr. Kommos to Sedgwick dated October 19, 2010, providing office notes, the surgery report, and advising that Plaintiff's inability to work (or stand or walk for long periods) would continue through January 30, 2011 (AR000184–192);

(12) correspondence from Sedgwick to Plaintiff dated October 21, 2010, advising Plaintiff that she is approved for LTD benefits through December 2, 2010 (AR000194–195);

(13) a Functional Capacity Evaluation dated November 11, 2010 (AR000197–213);

(14) a December 17, 2010 Referral Form for an initial independent physician advisor ("IPA") review (AR000217–240);

(15) an IPA Report by Howard Schuele, M.D. dated December 30, 2010 (AR000241–243);

(16) correspondence from Sedgwick to Plaintiff dated January 4, 2011, advising that her claim for LTD benefits "is terminated effective December 3, 2010" (AR000245–250 (the "Initial Termination Letter"));

(17) a January 17, 2011 request for appeal of the Initial Termination Letter from Plaintiff to Sedgwick (AR000251–252), and correspondence from Sedgwick to Plaintiff dated January 18, 2011, acknowledging receipt of Plaintiff's appeal (AR000253–256);

(18) a facsimile dated January 26, 2011 from Dr. Kommos to Sedgwick providing additional treatment notes and information (AR000257–258);

(19) a facsimile from Dr. Golovac to Sedgwick providing records supporting Plaintiff's disability claim (AR000259–265), including a "Certification of Health Care Provider for Employee's Serious Health Condition" completed by Dr. Golovac (AR000266–268);

(20) Sedgwick's "External Physician Advisor Referral Form" dated February 17, 2011 (AR000270–271);

(21) the Report of Martin G. Mendelssohn, M.D. (AR000273–277), and a Supplemental Report of William C. Andrews, Jr., M.D. (AR000291–292);

(22) the Report of Jamie Lee Lewis, M.D. (AR000278–280), and the Supplemental Report of Jamie Lee Lewis, M.D. (AR000293–294);

(23) a facsimile dated February 28, 2011 from Plaintiff to Sedgwick regarding her ongoing treatment with Drs. Kommos and Golovac (AR000281–282);

(24) correspondence dated March 10, 2011 from Sedgwick to Plaintiff affirming the Initial Termination Letter (AR000297–302 (the "Appellate Decision"));

(25) correspondence dated May 10, 2011 to Sedgwick from Plaintiff appealing the Appellate Decision (the "Second Appeal" (AR0003 03–329)) and submitting a letter from the Social Security Administration ("SSA") awarding disability benefits to Plaintiff effective April 27, 2011 (the "SSA Determination Letter" (AR000309–316; Doc. No. 53, Part IX, ¶ 9)) and additional medical records (AR000317–328);

(26) correspondence to Sedgwick from Plaintiff concerning the overpayment to her resulting from the SSA award (AR000330–336) and providing a copy of correspondence from the SSA concerning calculations of Plaintiff's award (AR000331–336);

(27) correspondence dated May 11, 2011 from Sedgwick to Plaintiff acknowledging her Second Appeal (AR000337);

(28) correspondence dated June 24, 2011 from Sedgwick to Plaintiff providing notice that Sedgwick was extending the deadline to resolve the Second Appeal as "permitted by the ***Walgreens Family of Companies Income Protection Plan (LTD)***" (AR000338) (emphasis added);[6]

(29) Sedgwick's referral for a physician advisor's review dated July 7, 2011 (AR000339);

(30) John M. Graham, D.O.'s report concluding that Plaintiff is not "disabled" as of December 3, 2010 (AR000340–343);

(31) Charles Brock, M.D.'s report concluding that Plaintiff is disabled from "a pain management perspective" from "12/03/10 through 04/08/11" (AR000344–347);

(32) Curriculum Vitae for Drs. Andrews, Brock, Graham, Lewis, and Schuele (AR000375–395);

(33) correspondence dated July 28, 2011 from Sedgwick to Plaintiff resolving her second appeal (AR000351–354 (the "Final Determination"));

(34) correspondence dated October 3, 2011 from Plaintiff's counsel to Sedgwick requesting a "review/appeal" of the Final Determination (AR000362–369 (the "Appeal Request"));

(35) correspondence dated October 11, 2011 from Sedgwick to Plaintiff's counsel denying the Appeal Request because "the Walgreen Income Protection Plan only allows for two appeals" (AR000371);[7]

---

**6.** The varied names used to reference the ERISA plan at issue in this litigation has confused matters presented to the Court, particularly those concerning the documents that comprise the plan and whether Sedgwick was properly afforded deference under the plan. (*Infra* CONCLUSIONS OF LAW, Part III.B.)

**7.** Upon review at the bench trial, neither the Court nor Defendants' witnesses could identify a two appeal limitation in the SPD. Rather, the explanation of appeals in the SPD describes only one appeal to Sedgwick and a "potential review" by the Plan Administrator (who is identified as "The Director of Risk Management and Benefits"). (AR000407.) Here, Plaintiff was afforded two appeals to

(36). a copy of the SPD (AR000398–410); and

(37) a copy of "Walgreen's LTD Step Process" manual for "Management of New and Ongoing LTD Claims" (AR000411–462) and handling appeals (AR000463–486) (collectively, the "Manual").

## B. Testimony of Timothy McGrory

Mr. Timothy McGrory testified as the corporate representative for Walgreen. (Doc. No. 53 at 11.) Mr. McGrory is an attorney licensed to practice law in the State of Illinois. He works for Walgreens in its employee relations department, providing advice and counsel concerning employee benefit matters, particularly employee benefit plans and ERISA compliance. Mr. McGrory reviews Walgreen's various benefit plans, including the IPPPRN, and he provides advice concerning such plans.

Mr. McGrory testified that the SPD is the "plan document" for the IPPPRN, and there are no "other governing plan documents that relate to" the IPPPRN aside from the SPD. According to Mr. McGrory, the SPD sets forth: (1) the "obligations" of the plan provider; (2) the "employee rights" as to making a claim under the plan; (3) the procedures for making a claim; and (4) the procedures for appeals of claims and claim denials. He further testified that:

ERISA requires that a plan have a plan document. And they require each plan document have a summary plan description so that the plan is written in a plain English manner understandable to everybody, not just to lawyers. So the terms of this plan, we include all of the ERISA bells and whistles to make it the

plan document, but it's also written in a plain English manner so it can serve as a summary plan description. And I believe there's court cases from around the country that say it's perfectly acceptable.

With respect to the source of Sedgwick's authority to independently and finally resolve LTD claims under the IPPPRN, Mr. McGrory pointed to language in both the SPD and the Addendum. Specifically, Mr. McGrory pointed to language at page 17 of the SPD (AR000407), which is intended to "clarify ... the function Sedgwick performs, it's their sole discretion, so it is not any other entities involved in their determinations" and to make "clear that there is not going to be an appeal to Walgreens outside of this process [set forth in the SPD]." In addition, Mr. McGrory pointed to language in the Addendum at page 10 as granting "discretion to Sedgwick." (Defendant's Exhibit 2, Addendum, at 10.) Mr. McGrory further testified that Walgreen's involvement in LTD claims administration was limited to "reviewing employee records" to determine if an employee was eligible under the IPPPRN. With respect to Plaintiff, Mr. McGrory testified that Walgreen did not "review ... medical records with regard to her claim."

On cross-examination, Mr. McGrory could not state when the IPPPRN came into existence, and he did not know if a document exists concerning the initial creation of the IPPPRN.[8] Mr. McGrory further testified that no document exists that "lays out the procedures for delegating discretion to a third-party administrator like Sedgwick" for the IPPPRN. Mr. McGrory confirmed that other summary plan descriptions existed before June 2007,

---

Sedgwick, but no "review" by the Plan Administrator. The authority for Sedgwick's representation to Plaintiff concerning the two appeal limit is unclear.

8. Again, the 2010 and 2011 Form 5500s represent that the "effective date" for the "Income Benefit Plan" is listed as January 1, 1993. (Joint Exhibits 6 and 7.)

and such summary plan descriptions named "a third-party administrator other than Sedgwick."[9]

### C. Testimony of Cynthia Craig

Ms. Craig is the "Manager Operations/Client Services and Assistant Vice President for Sedgwick." (Doc. No. 53 at 11.) As such, Ms. Craig manages "the day-to-day operations of the Walgreens disability program for all fifty states, including Puerto Rico" and including the IPPPRN. Ms. Craig managed the supervisors and examiners who considered Plaintiff's claim, and she released the initial correspondence advising Plaintiff that her LTD benefits were terminated (the "Initial Termination Letter" (AR000245–247)).

On cross-examination, Ms. Craig confirmed that Sedgwick approved Plaintiff's claim for LTD benefits on August 6, 2010, after which Plaintiff's claim fell within the "LTD step process for ongoing claims" provided in the Guidelines.[10] (AR000165–166 (providing correspondence dated Aug. 6, 2010); AR000183–184 (providing correspondence dated Sept. 15, 2010 advising Plaintiff that "after review of the medical documentation submitted by your physician, you have been approved to receive" LTD benefits until October 14, 2010); AR000194–195 (providing correspondence dated Oct. 21, 2010 advising Plaintiff that "after review of the medical documentation submitted by your physician, you have been approved to receive" LTD benefits until December 2, 2010).)

Ms. Craig explained that Sedgwick geographically and organizationally separates the appeals process from the process of initial claim determination. Nonetheless, the appellate division and the initial claim determination divisions of Sedgwick use the same vendors for their medical peer reviews. In addition, Ms. Craig testified that after a second appeal, LTD claimants have no additional recourse with Sedgwick or Walgreen. With respect to social security determinations and benefits, Ms. Craig testified that "typically," Walgreen will pay LTD benefits, and then when a notice of a Social Security Administration award "comes in" Sedgwick sends Walgreen a letter so that Walgreen "can reduce the monthly payment" and "calculate if there's an overpayment."

Similarly to Mr. McGrory, Ms. Craig testified that the sources of Sedgwick's discretion to resolve a Walgreen employee's claims for LTD benefits is the SPD, the Service Agreement and the Addendum. Specifically, Ms. Craig testified that: (1) the SPD is the "governing plan document that Sedgwick utiliz[es] to determine whether someone would be eligible under the plan," and (2) there are no other "governing plan documents that Sedgwick" uses "in its initial claims examining process." Like Mr. McGrory, Ms. Craig also testified that Walgreen has no "role" in determining whether a disability "claim

---

**9.** According to Mr. McGrory, "Metlife was the claims administrator for the plan for disability benefits prior to Sedgwick being retained in 2007." And, MetLife, was "granted discretion under the plan" pursuant to another "service agreement" with Walgreen. Mr. McGrory testified that MetLife never ceded its discretion under the IPPPRN. Further, Mr. McGrory does not know if an amendment to the IPPPRN occurred when MetLife ceased acting as the claim administrator for the IPPPRN. According to Mr. McGrory, Walgreen and MetLife "just terminated" their service agreement.

**10.** In response to a leading question, Ms. Craig provided the seemingly inconsistent testimony that Plaintiff "was conditionally approved during the review process and for a period of time but then ultimately terminated as of a certain date."

has merit with regard to medical documentation."

## III. Documents Concerning the Plan and Claims Administration

### A. The SPD

Both of Defendants' witnesses testified that the SPD is the primary "plan document" for the IPPPRN.[11] The SPD identifies the "Plan Name" as "Walgreen Income Protection Plan for Pharmacists and Registered Nurses", the "Plan Sponsor" as Walgreen Co., the "Plan Administrator" as the "Director of Risk Management and Benefits",[12] and the "Claim Administrator" as Sedgwick. (AR000409.) In addition, the SPD provides that costs for the plan are paid by Walgreen "from general assets, and from a trust" and the "trustee" is "Northern Trust" located in Chicago, Illinois. (*Id.*)

#### 1. Eligibility for Benefits Under the SPD

According to the SPD, claimants are "eligible for plan benefits when a disability resulting from illness, injury or pregnancy prevents [the claimant] from working." (AR000402.) For purposes of STD benefits, "the words 'disabled' or 'disability'" mean that, "due to sickness, pregnancy, or accidental injury, you are receiving appropriate care and treatment from a doctor on a continuing basis and you are prevented from performing one or more of the essential duties of your Walgreens occupation." (*Id.*) For purposes of LTD benefits, the SPD provides a similar definition for "'disabled' or 'disability.'" (*Id.*) Specifically, the SPD provides that

> "disabled" or "disability" means that due to sickness, pregnancy, or accidental injury, [the claimant] is prevented from performing one or more of the essential duties of [her] own occupation and are receiving appropriate care and treatment from a doctor on a continuing basis; and ... for the first 18 months of [LTD] benefits [the claimant] is unable to earn more than 80% [of her] pre-disability earnings or indexed pre-disability earnings at [her] own occupation from any employer in [claimant's] local economy....

(AR000402.)

#### 2. Submission and Resolution of Claims Under the SPD

The SPD provides guidance concerning "How to File a Claim," the "Procedures for Reviewing Claims," and how to obtain review of a denied claim. (AR000406–407 (instructing employees to "call Sedgwick CMS Disability Claim Center" to "submit a claim").) The SPD explains that Sedgwick and the Claim Administrator will make "final and binding" benefit determinations as follows:

> The authority granted to the Claim Administrator [Sedgwick] and the Plan Administrator to construe and interpret the Plan and make benefit determinations, including claims and appeals determina-

11. ERISA requires that participants and beneficiaries must be provided with a "summary plan description of any employee benefit plan." 29 U.S.C. § 1022(a); 29 U.S.C. § 1024(b) (requiring publication of "the summary plan description ... and all modifications and changes referenced in section 1022(a)"). Defendants' witnesses testified that copies of the SPD are distributed to Walgreen's store managers who then provide copies to employees as the employee becomes eligible for benefits under the IPPPRN. In this case, the AR indicates that Walgreen provided Plaintiff a copy of the SPD when she initially submitted her claim for STD benefits. (AR000030–41.)

12. Although the SPD identifies the "Director of Risk Management and Benefits" as the "Plan Administrator," the parties have stipulated to the "undisputed fact" that "Walgreens in [sic] the Plan Administrator under the Plan." (Doc. No. 53, Part IX, ¶ 2.)

tions, shall be exercised by them (or persons acting under their supervision) as they deem appropriate in their sole discretion. Benefits under this plan will be paid or provided to you only if the Claim Administrator [Sedgwick] or the Plan Administrator, as the case may be, decides in its discretion that you are entitled to them. All such benefit determinations shall be final and binding on all persons, except to the limited extent to which the Claim Administrator's [Sedgwick] decisions are subject to further review by the Plan Administrator. (AR000407.) The SPD further provides that "Walgreen Co. and Sedgwick CMS reserve the right to determine whether your disability qualifies for benefits." (AR000406.)

### 3. Preparation, Amendment, Modification, and Termination of the SPD

As indicated on its cover page, the SPD was "Prepared by the Walgreen Co. Benefits Department for Walgreen Employees" (the "Benefits Department"). (AR000398.) According to Mr. McGrory, the Benefits Department referenced in the SPD is located "a floor below" his office, and it "prepare[s] all of the benefit plan communications for the various welfare and profit-sharing plan [s]" for Walgreen. Mr. McGrory further testified that he "review[s] the work product" of the Benefits Department, and every "communication" from them comes through Mr. McGrory "for legal compliance." Mr. McGrory reviewed the SPD itself "before it was sent to the printer," and it was not "supposed to be signed by anyone."

In addition to identifying the Benefits Department as its preparer, the first page of the SPD provides the following information concerning the purpose of the SPD and the possible amendment, modification, or termination of the IPPPRN:

> This Summary Plan Description booklet describes the Walgreen Co. Income Pro-

tection Plan for Pharmacists and Registered Nurses (the "Plan") as in effect as of June 1, 2007. You should read the information provided in this booklet so that you will have a full understanding of the benefits provided and the other relevant terms and conditions of the Plan.

**This Summary Plan Description is the official Income Protection Plan governing document for purposes of describing the various plan provisions.** Please understand that [Walgreen] reserves the right to amend, modify or terminate this plan, including any benefits provided under this plan, at any time and for any reason. You will be notified of any changes to the Plan within a reasonable amount of time, but not always prior to the time the change goes into effect. To determine the proper benefits at any given time, it is necessary to consult the Summary Plan Description booklet that is in effect at the relevant time.

(AR000399 (emphasis in original).) With respect to amendments, modifications, and terminations, the SPD further provides that "Walgreen Co. reserves the right to alter, amend or cancel the Plan at its sole discretion." (AR000409.) Further, "[m]odification to the Plan, including amendment and termination, *will be implemented at the written direction of the Chief Executive Officer of the Company.*" (*Id.* (emphasis added).)

### B. The Service Agreement and Addendum

Defendants' witnesses identified the Service Agreement and Addendum as the documents addressing the arrangement between Sedgwick and Walgreen for Sedgwick to provide "Claim Administration" services in relation to several sources of claims, including workers' compensation

and disability claims.[13] Specifically, Mr. McGrory testified that the "purpose" of the Service Agreement is "to establish a relationship, a more formal relationship between Walgreens and Sedgwick" and to document payment terms. Under the Service Agreement, the Claim Administration services provided by Sedgwick include:

(1) Reviewing each "Qualified Claim" and processing each claim "in accordance with all applicable local, state and federal laws, rules and regulations" (Defendants' Exhibit 2, Service Agreement, ¶ 1.A.(1));

(2) Conducting an investigation of each Qualified Claim to the "extent deemed necessary" by Sedgwick in the performance of its obligations under the Service Agreement (*id.* ¶ 1.A.(2));

(3) Arranging for "independent" medical experts "to the extent deemed necessary by Sedgwick in the performance of its obligations hereunder" (*id.* ¶ 1.A.(3)); and

(4) Paying benefits, expenses and "adjusting or settling each Qualified Claim . . . ." (*id.* ¶ 1.A.(4)).

As recognized by Defendants' witnesses, several provisions of the Service Agreement address the discretion afforded to Sedgwick in conducting its Claim Administration duties. For instance, under the

terms of the Addendum, Sedgwick acknowledged that it received a "summary plan description" for the "Income Protection Plan for Pharmacists and Nurses." (*Id.* Addendum, at 10.) And, Sedgwick agreed "to administer STD and LTD claims in compliance with the applicable summary plan descriptions, as well as [ERISA], as amended, IRS and Department of Labor guidance, and all applicable federal, state and local laws and regulations."[14] (*Id.*)

As to Sedgwick's Compensation for administration of long term disability claims, under the Addendum, Walgreen agreed to pay Sedgwick $0.58 per employee per month, plus $75 per open claim per month. (Defendants' Exhibit 2, Addendum, at 8.) In addition, Walgreen paid Sedgwick $325 per "non-eligibility appeal" and $175 per "eligibility appeal." (*Id.*) According to Ms. Craig, Sedgwick has "a financial advantage by having an LTD claim remain open" because Sedgwick is paid monthly for every open claim. Further, if an LTD claim is granted, then the claim remains "open" for purposes of calculating the fee collected by Sedgwick.

## C. The "Step Process" Manual

Sedgwick's LTD claims handling guidelines are set forth in the Manual provided at AR000411–486. According to Ms.

---

**13.** Mr. McGrory was unclear concerning when Sedgwick began providing such services in relation to the SPD. He testified that Sedgwick did not provide Claim Administration services in relation to STD and LTD benefit claims under the SPD until 2010, and the Addendum "added" the SPD to other plans administered by Sedgwick. However, the SPD itself references Sedgwick as the Claims Administrator for STD and LTD claims as early as 2007. (AR000409.) On its face, the Service Agreement covers the term July 1, 2004 to June 30, 2009. (Defendant's Exhibit 2 at Service Agreement, ¶ 5.A.) And, the Addendum is dated July 1, 2010, and "extends" the term of the Service Agreement

from July 1, 2010 through June 30, 2015. (*Id.* at Addendum, p. 1.)

**14.** In addition, under Paragraph 1.A.(4) of the Service Agreement, Sedgwick is authorized to pay benefits, "but only if in the sole judgment of Sedgwick, *such payment would be prudent for Client* [Walgreen] . . . ." (Defendants' Exhibit 2, Service Agreement, ¶ 1.A.(4) (emphasis added).) The Defendants' witnesses did not specify whether this provision applies to Sedgwick's handling of LTD claims. If it does, it would raise questions concerning a conflict of interest in the claim determination process. (*Infra* CONCLUSIONS OF LAW, Part III.)

Craig, the Manual provides "the process that examiners would follow" in handling a claim. For instance, the initial claim determination process includes eighteen possible steps, including: (1) the "10–week Review Process" (Step 1); (2) "Follow-up of LTD Application and Other Requests" (Step 5); (3) "PA" (physician advisor) "and IME" (independent medical examination) "Referral Requirements" (Step 8); (4) "Claim Denial Workflow" (Step 10); (5) "Ongoing Claim Review Process" (Step 14); and (6) "Surveillance Request Procedures" (Step 18). (AR000411–462.) The appeal process guidelines include eleven steps, including: (1) "Receipt of Appeal in the National Appeals Unit" (Step 1); (2) "Additional Medical Submitted with Appeal" (Step 3); (3) "Tolling Extensions" (Steps 7a through 7e); and (4) "Completion of the Appeal Review" (Step 11). (AR000463–486.)

## IV. Plaintiff's Occupation

In 2010, Plaintiff was employed by Walgreen as a staff pharmacist for more than three years. (AR000167–175; Doc. No. 53, Part IX, ¶ 6.) "Staff pharmacist" is Plaintiff's "own occupation" under the terms of the SPD. (AR000168.) The position of pharmacist is considered "light" work which requires "continual walking and standing" and some bending and reaching. (AR000218, AR000352.)

## V. Plaintiff's Medical Conditions

In February 2004, Plaintiff's medical records indicate that Dr. Kommos began treatment in relation to Plaintiff's complaints of back pain.[15] (AR000318.) Treatment notes for an office visit on May 26, 2004, describe Plaintiff as "[n]eurologically ... intact," although an x-ray of Plaintiff's "lumbar spine" showed "retrolisthesis of L4 over L5, extensive DJD [degenerative disc disease, and] loss of

disc height in that area." (*Id.*) Dr. Kommos recommended spinal fusion surgery for Plaintiff "as there is only one disc at L4–5 with major degenerative changes with instability and traction spur." (*Id.*) In treatment notes from May 27, 2004, Dr. Kommos noted that an MRI confirmed "extensive DJD" as well as "edema around the disc at L4–5 with collapse and foraminal stenosis." (*Id.*) Dr. Magee's findings in relation to the MRI further indicate that Plaintiff suffered from "disc desiccation" and "posterocentral annualar bulge" of disc at L3–4 and L4–5. (AR000320.) In July 2004, Plaintiff proceeded with spinal surgery. (AR000321.)

Two years after her surgery in 2004, Plaintiff again sought treatment from Dr. Kommos related to back pain on September 27, 2006. (AR000323.) Dr. Kommos noted that he did "not see any evidence here that anything has gone wrong," and her x-rays showed that her "fusion looks real good and looks solid." (*Id.*) Dr. Kommos prescribed ibuprofin and recommended physical therapy. (*Id.*) Two years later, in March 2008, Plaintiff returned to Dr. Kommos complaining of back pain. (AR000323.) This time, Plaintiff's x-ray showed "DJD at L3–L4 and progression of the disease at a higher level." (*Id.*) Dr. Kommos noted that "[n]eurologically," Plaintiff was "okay." (*Id.*) Dr. Kommos again recommended physical therapy and "anti-inflammatories." (*Id.*)

On February 25, 2010, Plaintiff did not report to work at Walgreen due to pain in her back. At that time, Plaintiff again sought treatment from Dr. Kommos. Plaintiff saw Dr. Kommos on February 25, 2010, complaining of back and hip pain. (AR00045.) X-rays showed that Plaintiff's hip was "entirely normal;" however, her back showed "complete collapse at L3–L4 with osteophyte formation suggestive of

---

**15.** Plaintiff began seeing Dr. Kommos as early as March 1998. (AR000317.)

instability at the level of L3–L4." (*Id.*) Dr. Kommos noted that "[n]eurologically, [Plaintiff was] otherwise intact." (*Id.*) Dr. Kommos gave Plaintiff an injection, prescribed Darvocet, and ordered an "MRI." (*Id.*)

Treatment notes from March 4, 2010, indicate that Plaintiff reported problems working as a pharmacist because the standing and lifting "aggravated" her back. (AR000324; AR000048.) The "most recent MRI" showed DJD "at L4–L5" that "is quite patent," and x-rays showed "severe DJD at L3–L4 with near collapse in that area." (AR00063.) Dr. Kommos still described Plaintiff as neurologically "intact." (*Id.*) Dr. Kommos excused Plaintiff from work for four weeks and wrote:

> In the meanwhile, I am going to give her epidural blocks. She does understand that she may require to [sic] have extension of fusion to level above if she continues to be symptomatic. She does understand that if she ... has [the] fusion that *she may not be able to return back to do her work on the long run* [sic].

(*Id.* (emphasis added).) On March 11 and March 25, 2010, Plaintiff received epidural blocks, but they did not provide her with relief. (AR000324–325.) On April 1, 2004, Dr. Kommos wrote that Plaintiff is neurologically intact, but she "has severe [DJD] at L3–L4 resulting in mild-to-moderate foraminal stenosis, ... traction spur, and solerosis at the endplate," (AR000077), and she should not work for "2 months" from April 1. (AR000073.) The following day, on April 2, 2010, Dr. Kommos noted that he would "set [Plaintiff] up for" an "extension and fusion of L3–4," and he again noted that "[n]eurologically, [Plaintiff] is intact." (AR000325.)

On May 14, 2010, Dr. Kommos performed surgery on Plaintiff, including the following procedures: (1) exploration of previous fusion mass; (2) removal of hardware; (3) spinal decompression; (4) neurolysis of L3 and L4 nerve root; (5) bone graft harvested from the left iliac crest; (6) posterolateral fusion; and (7) spinal fusion. (AR00090–91.) Postoperative notes indicate that Plaintiff "did very well," the "post-operative period was unremarkable," and Plaintiff was "released home" with pain medication, muscle relaxant, and instructions concerning follow-up. (AR000092.) On June 3, 2010, Plaintiff had a follow-up appointment as a result of which Dr. Kommos noted that her wound was "healed" and there was "no tenderness over the incision site." (AR000097.) Dr. Kommos warned Plaintiff to watch for infection and to "continue the same regime." (*Id.*). Dr. Kommos further noted that Plaintiff's "disability status" would extend past her next appointment in July. (*Id.*)

On July 28, 2010, Plaintiff had another follow-up appointment with Dr. Kommos. The treatment notes from that day provide as follows:

> [Plaintiff's] x-rays are quite satisfactory. She did have 2–level fusion. This lady does have only 4 lumbar vertebrae and I explained that to her. The fusion seems to be solid. She is doing well. She is going to come back and see me again in another 4 weeks. Meanwhile continue wearing the brace.

(AR000101.) Dr. Kommos also completed a PCE on July 28, 2010 indicating the following physical restrictions for Plaintiff for "up to 1 year from surgery"—(a) only 30 minutes to 1 hour of sitting, standing, and walking; (b) no pushing, pulling, or "floor-to-waist" lifting; (c) rare reaching and over shoulder lifting; and (d) occasional keyboarding and "waist-to-shoulder" lifting of 4–5 pounds. (AR000102.)

On September 2, 2010, the Plaintiff visited Dr. Kommos for an "evaluation."

(AR000178.) At that time, Plaintiff reported that she was "still having a lot of back pain, [and] she cannot return back to work, . . . [s]he cannot stand or sit for any extended period of time." (*Id.*) Dr. Kommos noted that Plaintiff's "x-rays do show a good fusion mass and good interbody fusion . . . , [n]eurologically, she is intact . . . . [and Plaintiff] has four lumbar vertebrae." (*Id.*) Dr. Kommos further noted that *"the final long-term outcome of this back surgery may not be determined before one year from the day of surgery."* (*Id.* (emphasis added)) Dr. Kommos extended Plaintiff's "excuse from work" for six weeks to her "next visit." (*Id.*)

At Plaintiff's next visit with Dr. Kommos on October 14, 2010, the treatment notes indicate that Plaintiff is still "having a lot of back pain, . . . she cannot do all the tests and she cannot stand" or bend or stoop for "any extended period of time." (AR000190.) Dr. Kommos noted that Plaintiff's "x-rays are quite satisfactory." (*Id.*) The treatment notes also state that Plaintiff is waiting to have a functional capacity evaluation ("FCE"), and she applied for permanent disability with Social Security. (*Id.*) Dr. Kommos advised Plaintiff to continue to wear her brace and follow up in another six weeks. (*Id.*)

Plaintiff's next visit with Dr. Kommos on December 2, 2010 was after her FCE "which revealed that [Plaintiff] could not be evaluated from the functional level." (AR000216.) At that appointment, Dr. Kommos "extended" Plaintiff's "disability for another three months." (*Id.*) Although the December 2, 2010 treatment notes indicate that Dr. Kommos would not see Plaintiff for three months (*id.*), Plaintiff had an appointment with him on January 13, 2011. (*Id.*) At the January 13, 2011 appointment, Plaintiff complained of "still having a lot of pain in her back radiating down [her] left lower extremity." (AR000258.) Dr. Kommos opined that

"the continuation" of Plaintiff's pain "could be related to perineural scar tissue." (*Id.*) Dr. Kommos refilled her pain medication, advised Plaintiff to continue physical therapy, and noted that Plaintiff may require "a series of lumbar epidural." (*Id.*)

In February 2011, Plaintiff sought treatment from Dr. Golovac for her continued pain. (AR000260–264.) Dr. Golovac's treatment notes state that Plaintiff's back pain is "aggravated by . . . prolonged standing . . . and bending forward" among other things. (AR000261.) Dr. Golovac diagnosed Plaintiff with Postlaminextomy, Lumbar Syndrome, and Chronic Pain Syndrome. (AR000262.) Dr. Golovac suggested that Plaintiff be treated with a "spinal cord stimulator." (AR000263.) Finally, Dr. Golovac completed a "Certification of Health Care Provider for Employer's Serious Health Condition" indicating that Plaintiff was "incapacitated" due to her medical condition. (AR000267.)

## VI. Plaintiff's STD and LTD Claims and Sedgwick's Claims Handling

### A. Plaintiff's STD Claim

Plaintiff ceased working as a pharmacist for Walgreen on February 25, 2010 (Doc. No. 53, Part IX, ¶ 7), and she submitted a claim under the SPD for STD benefits. (AR00027; AR00030–41.) At the outset, Sedgwick advised Plaintiff to forward documentation concerning any award from the SSA (AR000032), and Plaintiff executed an "Agreement for Recovery of Overpayment of Benefits" resulting from an SSA award or other income sources. (AR00047.) Plaintiff also submitted authorizations for the release of her medical information to Sedgwick. (AR000046, AR000049.) Sedgwick then requested and received medical records from Dr. Kommos, which Dr. Kommos updated throughout the Spring and Summer of 2010. (AR000045, AR000051, AR000057, AR000063,

AR000073–74, AR000077–79, AR000089–92, AR000097, and AR000101.)

In addition to providing treatment notes, Dr. Kommos also sent Sedgwick periodic facsimiles indicating time periods that Plaintiff's medical conditions prevented her from working. (AR000048, AR000054, AR000064–68, AR000072–74, AR000075–79.) Dr. Kommos completed the PCE on July 28, 2010, which identified Plaintiff's anticipated significant physical restrictions for *"up to 1 year from surgery."* (AR000102 (emphasis added) (advising that Plaintiff could stand for no longer than 30 minutes to one hour).) Dr. Kommos also provided a written response to Sedgwick's question: "When do you expect Ms. Wilson will be able to return to her job as a Pharmacist?" (AR000099.) In response, Dr. Kommos wrote that Plaintiff "Will be able to return in Teaching Capacity in the Spring of 2011—*(may be permanently disabled from her current position )."* (*Id.* (emphasis added).)

In a series of "Disability Benefit Notice[s]" and correspondence to Plaintiff, Sedgwick incrementally approved Plaintiff's STD claim from February 25, 2010 through August 23, 2010. (AR000053, AR000060, AR000070–71, AR000081–82, AR000087, AR000094–95, AR000104, and AR0000106; *see also* Doc. Nos. 1 and 21.) According to Sedgwick, August 23, 2010 was "the maximum time allowed under the Walgreens Co. Income Protection Plan." (AR000106; Doc. No. 53, Part IX, ¶ 11.) At the conclusion of the period of STD benefits, Sedgwick advised Plaintiff to "fill out the appropriate forms" for LTD benefits and to return them to Sedgwick "as soon as possible." (AR000106.)

### B. Plaintiff's LTD Claim

#### 1. Plaintiff's LTD Application

When Plaintiff's STD benefits expired, Sedgwick advised Plaintiff that she may be eligible for LTD benefits (the "Initial LTD Correspondence"). (AR000157–164.) In the Initial LTD Correspondence, Sedgwick advised Plaintiff that she must apply to the SSA for disability benefits and provided information concerning the entity Walgreen "contracted with" to "help" her coordinate the "required application for Social Security benefits," to "track" the progress, and to "keep Walgreens informed." (AR000157–158.)

In accordance with Sedgwick's instructions, Plaintiff submitted an application for LTD Benefits (AR000167–175 (the "Application").) In her Application dated August 10, 2010, Plaintiff stated that her "lower lumbar vertebra are fused," and she had the following physical limitations: she "cannot bend, twist, or stoop down … lift anything over 4–5 lbs … [perform] repetitive motion like pulling or pushing …, [or] reach above [her] head to retrieve objects." (AR000172.) Plaintiff further stated that she is limited to about 30 minutes to an hour at a time of sitting or standing, which causes her pain, and she is limited in driving. (*Id.*) In addition, Plaintiff stated that she has to wear a hard "thorasic [sic] / lumbar" brace. (*Id.*) All of Plaintiff's claims were substantiated by the PCE and medical documentation submitted to Sedgwick in relation to Plaintiff's STD Claim. (AR000102; *see also* AR000045, AR000051, AR000057, AR000063, AR000073–74, AR000077–79, AR000089–92, AR000097, and AR000101.)

#### 2. Sedgwick's Initial Approval of Long Term Disability Benefits

In a letter dated August 6, 2010, Sedgwick approved Plaintiff's claim for LTD benefits "payable as of August 24, 2010 through September 2, 2010." (AR000165–66 (the "Initial LTD Approval Letter"); Doc. No. 53, Part IX, ¶ 13.) In the Initial LTD Approval Letter, Sedgwick again advised Plaintiff that she was required to: (1) apply for "Social Security" benefits; (2)

provide a receipt of such application to Sedgwick; (3) provide a copy of any correspondence from the SSA notifying Plaintiff when a decision is reached; and (4) call Sedgwick to advise it when the SSA decided her claim. (AR000166.) Sedgwick also advised Plaintiff that she would have to submit "additional medical information" throughout her "absence" from work. (AR000165 (stating that Sedgwick's LTD "Specialist" would "partner" with Plaintiff "to ensure that requested medical documentation is provided in a timely manner").)

Following the Initial LTD Approval Letter, Sedgwick continued to approve, in increments of several weeks to a month, Plaintiff's requests for continuation of LTD benefits under the Plan. (AR000183 (correspondence dated September 15, 2010, approving LTD benefit payments through October 14, 2010); (AR000194–95 (correspondence dated October 21, 2010, approving LTD benefit payments "through December 2, 2010").) Sedgwick also continually requested "specific additional information" to substantiate "extension" of Plaintiff's LTD benefits. (AR000183 and AR000194 (requesting Plaintiff's "most recent … office notes," operative and diagnostic "test results," rehabilitation or therapy notes, names and "dosages of all medications," and "[d]etails on restrictions and limitations").)

Plaintiff and Dr. Kommos responded to Sedgwick's requests for information by providing updated treatment notes (AR000178, AR000180, AR000190, AR000216, and AR000258), as well as facsimiles and memos concerning Plaintiff's inability to work (AR000175–179, AR000184–192, AR000196, AR000215–216, and AR000257–258.) For instance, in a memo dated September 13, 2010, Dr. Kommos advised that Plaintiff would be unable to work for approximately six to seven months from the date of the memo, which was "*1 year from surgery dated 5/14/10*," although Plaintiff "*may* be able" work at a "*sedentary position*" for two to four hours a day in the "early Spring 2011." (AR000181 (emphasis added).) Dr. Kommos' prediction of Plaintiff's recovery was consistent with the estimations he previously provided to Sedgwick and Plaintiff. (AR000102 (advising Sedgwick that Plaintiff could stand for no more then thirty minutes to an hour at a time for "up to 1 year from surgery"); AR00099 (advising Sedgwick that Plaintiff "may be permanently disabled from her current position"); AR00063 (advising Plaintiff that if she has the second spinal fusion surgery, "she may not be able to return back to do her work [in] the long run").)

### 3. The Functional Capacity Evaluation ("FCE")

 Approximately six months after her spinal surgery, on November 11, 2010, Plaintiff presented for a Functional Capacity Evaluation (the "FCE").[16] (AR000197–240; Doc. No. 53, Part IX, ¶ 17.) The FCE was conducted by physical therapist, Warren Chinyanganya (the "Therapist"). (AR000197–240.) The Therapist identified the following "deficits" during the FCE: "range of motion deficits, muscle strength deficits, palpable findings and flexibility restrictions." (*Id.*) With respect to musculoskeletal screening, the Therapist noted that Plaintiff's gait "is slow and antalgic without reciprocal trunk rotation."

---

**16.** Notably, the Therapist listed July 1, 2004—not May 15, 2010—as Plaintiff's "Surgery Date." (AR000197.) It is unclear whether this was a typographical or substantive error by the Therapist. Despite the six "independent" medical reviews obtained by Sedgwick, none of the physician advisors who were provided with the FCE noted the discrepancy in the date of surgery. Nonetheless, five of the physician advisors relied on the FCE to support their opinions that Plaintiff was not "disabled."

(AR000200.) Plaintiff's posture showed "a posterior trunk lean with a loss in lumbar lordosis, increased thoracic kyphosis and a forward head position." (*Id.*) Plaintiff's "soft tissues" had "palpable tenderness," and Plaintiff exhibited "muscle guarding in the lower lumbar paraspinals ... [and] a 6 inch surgical incision that has healed well." (*Id.*) Nonetheless, "due to self-limitation and lack of physiologic changes throughout the testing," the Therapist concluded that he could not classify Plaintiff's Physical Demand Level. (*Id.*; Doc. No. 53, Part IX, ¶ 18.) Plaintiff provided Sedgwick with a copy of the FCE on December 8, 2010. (AR000141.)[17]

### 4. The Medical Review by Howard M. Schuele, M.D. ("Dr. Schuele")

Soon after receipt of the FCE, Sedgwick arranged for board-certified orthopedic surgeon, Dr. Schuele, to review Plaintiff's medical records, including the FCE, and to opine on two questions. (AR000217–240 (the "Initial Referral").) Importantly, Sedgwick did not provide Dr. Schuele with available treatment notes from Dr. Kommos for the following seven dates: March 24, 2008, February 25, 2010, March 4, 2010, April 1, 2010, May 13, 2010, May 18, 2010, and May 24, 2010 (AR000045, AR00051, AR000057, AR000063, AR000073–74, AR000077–79, AR000089–92). (*Compare supra* FINDINGS OF FACT, Part II.A.3, at Paragraph (A)(5) (listing all of the treatment notes submitted by Plaintiff and Dr. Kommos in support of STD claim), *with* AR000241 (listing progress notes provided from Dr. Kommos as covering the period from June 3, 2010 through December 2, 2010).) Instead, Sedgwick only provided Dr. Schuele with medical documentation of Plaintiff's surgery on May 14, 2010, and Dr. Kommos' post-sur-

gery notes from June 3, 2010 through December 2, 2010. (AR000241.)

Based on this incomplete medical information, the first question Sedgwick submitted to Dr. Schuele was what "conditions have been indicated by the treating provider to affect the employee's ability to work? Explain." (AR000242.) Dr. Schuele responded as follows:

> There are subjective findings on office visits 09/02/10, 10/14/10, and 12/02/10 of continued back pain with difficulty standing, stooping, and bending. Objective findings on 09/02/10 state that she is neurologically intact and x-rays of 09/02/10 and 10/14/10 show good fusion mass and good interbody fusion. No other objective findings have been documented and these objective findings do not prevent her ability to perform her job.

(*Id.*) The second question Sedgwick submitted to Dr. Schuele asked "[i]s there objective medical information in the medical records or from the teleconference to support the employee's complete inability to work? Explain." (*Id.*) To this question, Dr. Schuele opined:

> No. As above, the objective findings do not support the employee's complete inability to work. The FCE does document problems with physical demands secondary to self-limitation. Further, the rapid exchange grip test showed submaximal effort. Her surgery was on the lower back which would affect the lower extremities. Strength in the upper extremities would not be affected from her surgery and from her diagnosis.

(*Id.*) Nowhere in the three-page Schuele Report does Dr. Schuele note that the job at issue is pharmacist, nor does he identify

---

**17.** FCEs are "routinely" relied on by plan administrators. *Townsend v. Delta Family-Care Disability & Survivorship Plan,* 295 Fed. Appx. 971, 977–78 (11th Cir.2008).

the physical tasks that were pertinent to whether Plaintiff could "perform her job."[18] (*Id.*) The Schuele Report was conclusory at best.

### 5. Sedgwick's Initial Termination of Benefits

Following receipt of the Schuele Report, Sedgwick provided correspondence to Plaintiff dated January 4, 2011, advising that "it has been determined that you do not qualify for continued disability benefits under the Plan . . . . [and, as] a result, your claim benefits terminated effective December 3, 2010." (AR000245–50 (the "Initial Termination Letter").) The Initial Termination Letter provided the following as the grounds for Sedgwick's decision:

> Upon review of the medical documentation, Dr. Schuele reported you underwent an exploration of previous fusion mass at L4–L5, removal of hardware from L4–L5, spinal decompression at L3–L4, neurolysis of the L3 and L4 nerve root, bone graft harvest from the left iliac crest, posterolateral fusion at L3–L4 and L4–L5, as well as interbody fusion at L3–L4 using a PEEK cage 7 mm wide, and spinal fusion from L3 to L5 using variable axis Synthes pedicular screws on May 14, 2010. The exam on September 2, 2010 showed you were neurologically intact. The x-ray showed good fusion mass and good interbody fusion. At the visit of October 14, 2010, Dr. El Kommos reported the x-rays showing good fusion mass and good interbody fusion. The [FCE] indicated there was self-limitation and sub-maximal effort and was not useful to determine functional capacity. Finally, Dr. Schuele [sic] the medical documentation does not support restrictions and limitations which would preclude you from

performing your job duties as a Pharmacist as of December 3, 2010.

(AR000246.)

In the Initial Termination Letter, Sedgwick advised Plaintiff that she or her "authorized representative" may appeal Sedgwick's decision "by submitting a written request for review of your denied claim (first level appeal) within 180 days after your receipt" of the Initial Termination Letter. (AR000246.) Sedgwick further instructed Plaintiff to "state the reason(s)" she believed her "claim was improperly denied." (*Id.*) Finally, Sedgwick informed Plaintiff that she "may also submit additional medical or vocational information, and any facts, data, questions or comments you deem appropriate for [Sedgwick] to give [her] appeal proper consideration." (*Id.*)

### C. Plaintiff's First Appeal

Plaintiff appealed the decision set forth in the Initial Termination Letter. (AR000251–52 (the "First Appeal").) In relation to her First Appeal, Plaintiff submitted additional medical documentation to Sedgwick, including: (1) medical records from Dr. Kommos opining that "the continuation" of Plaintiff's "pain could be related to perineural scar tissue" (AR000258); (2) documentation concerning her referral to and treatment by pain management specialist, Dr. Golovar (AR000257–258); (3) a "Certification of Health Care Provider for Employee's Serious Health Condition" executed by Dr. Golovar (AR000266–269); and (4) Plaintiff's summary of her ongoing medical treatments, epidural block injections, aquatic physical therapy, and use of a "Select 1.5 TENS unit at home." (AR000251.)

---

**18.** Although Dr. Schuele did not specify the job or physical requirements at issue, Sedgwick's Initial Referral provided to Dr. Schuele indicates that the pertinent job is "Pharmacist, Pharmacy Mgr." which requires "continual Walking & Standing; Some Bending & Reaching. *Light Work.*" (AR000218 (emphasis in original).)

### 1. Sedgwick's Additional Medical Reviews

In relation to Plaintiff's First Appeal, Sedgwick obtained medical reviews from three additional doctors, Board Certified Orthopedic Surgeons, Martin G. Mendelssohn, M.D. and William C. Andrews, Jr., M.D., and Jamie Lee Lewis, M.D., who was Board Certified in Physical Medicine and Rehabilitation and Pain Medicine. (AR000270–271.) As it did in seeking an opinion from Dr. Schuele, Sedgwick failed to provide Drs. Mendelssohn, Andrews, and Lewis with all of Dr. Kommos' treatment notes. In particular, Sedgwick again omitted the treatment notes from Dr. Kommos for the following seven dates: March 24, 2008, February 25, 2010, March 4, 2010, April 1, 2010, May 13, 2010, May 18, 2010, and May 24, 2010 (AR000045, AR00051, AR000057, AR000063, AR000073–74, AR000077–79, AR000089–92). *Compare supra* FINDINGS OF FACT, Part II.A.3, at Paragraph (A)(5) (listing all of the treatment notes submitted by Plaintiff and Dr. Kommos in support of STD claim), *with* AR000273 (listing progress notes provided from Dr. Kommos as covering the period from June 3, 2010 to January 13, 2011). With the incomplete medical documentation, Sedgwick also provided Drs. Lewis and Mendelssohn with the Schuele Report and the FCE. (AR000273, AR000278.) Based upon this limited record, Drs. Lewis and Mendelssohn both concluded that Plaintiff was "not disabled." (AR000273–277; AR000278–280; *infra* FINDINGS OF FACT, Part VI.C. 1.a., and Part VI.C. 1.b.) Dr. Andrews simply opined that he would not change Dr. Mendelssohn's opinion based upon a consideration of Dr. Kommos' PCE for Plaintiff. (*Infra* FINDINGS OF FACT, Part VI.C. 1.c.)

### a. Martin G. Mendelssohn, M.D. ("Dr. Mendelssohn")

In a five-page memorandum dated February 24, 2011 (the "Mendelssohn Report"), Dr. Mendelssohn provided the following "rationale" for his opinion that Plaintiff was not disabled:

> This claimant, who is 57 years of age and is a pharmacist, underwent a two-level fusion by Dr. El Kommos. Postoperatively, there was no evidence of any complication. X-rays revealed that the fusion matured. There was no evidence of any failure of hardware. However, the claimant continued to have subjective complaints. ***Dr. El Kommos did not provide a comprehensive examination that indicated that the claimant had functional or neurological deficits nor were there any supporting diagnostic studies.*** An FCE indicated the claimant provided a self-limiting effort and an accurate estimation of her physical capacities could not be provided. It should be noted that the claimant's upper extremity gripping tests were found to be weak and below the levels that one would expect; however, this would not be related to her back surgery and again indicated that there is self-limiting factor. The findings do not support the inability of the claimant to perform her regular unrestricted occupation as a pharmacist as of 12/03/10 to return to work.

(AR000276 (emphasis added).) Dr. Mendelssohn dismissed Plaintiff's reports of continued pain after her second spinal surgery as "subjective" and unsupported by "any clinical findings" from Dr. Kommos. (*Id.*)

In his Report, Dr. Mendelssohn also responded to five specific questions posed by Sedgwick. (AR000275.) The first question was "Is the employee disabled from her regular unrestricted job as of 12/03/10 to the return to work?" (*Id.*) Dr. Mendelssohn responded:

> No. Based on medical documentation, the claimant underwent a lumbar fusion

and has continued to have subjective complaints. *However, a comprehensive examination from Dr. El Kommos outlining functional deficits or neurological deficits is not provided.* X-rays revealed that there was no evidence of any problem with the fusion, which went on to maturity. During the FCE, the claimant was noted to have deficits and the physical demand category cannot be determined; however, it is noted that she may have had self-limitations, especially when testing her upper extremities, which would not be affected by the surgery of her lower extremities; and therefore, based on the fact that she may have not had a consistent effort and was self-limiting, the results cannot accurately predict her functionality. Therefore, the claimant is not disabled from her regular unrestricted occupation as of 12/03/10 to return to work based on the lack of any significant functional deficits or neurological deficits from an orthopedic perspective.

(*Id.* (emphasis added).)

The second question asked by Sedgwick was "If disabled, what is/are the disabling diagnoses and complicating factors/comorbidities and what is the rationale or basis for any disability?" (*Id.*) To this question, Dr. Mendelssohn responded:

> The employee is not disabled. Based on medical documentation, although the claimant has subjective complaints, *Dr. El Kommos has not provided any objective clinical findings or functional deficits that would correlate with her subjective complaints.* As already indicated, the FCE that was completed on 11/11/10 could not determine her physical capabilities based on self-limitation. It is also noted that she had difficulties with upper extremity testing, which was self-limiting; and certainly, any surgery in her lumbar spine would not affect her upper extremities. There is no documentation of any complicating fac-

tors/comorbidities, and therefore the claimant is not disabled from her unrestricted occupation as a pharmacist from 12/03/10 to return to work.

(*Id.* (emphasis added).)

Sedgwick's third question to Dr. Mendelssohn asked "What are the clinical findings contained in the medical record and how would these findings impact the employee's ability to function in her regular unrestricted occupation?" (AR000276.) Dr. Mendelssohn responded:

> Based on medical documentation, the claimant had subjective complaints, but Dr. El Kommos *has not provided any clinical findings to support her subjective complaints.* X-rays indicate that the fusion went on to maturity without any evidence of loosening or nonunion. Therefore, these findings would not impact the claimant's ability to function in her regular unrestricted occupation.

(*Id.* (emphasis added).) Dr. Mendelssohn responded "The employee is not disabled" to the fourth question "If disabled, what is the expected/appropriate length of disability?" (*Id.*) Finally, Dr. Mendelssohn gave the extremely confusing response "There are no findings that are not clinically significant" to the question "If there are findings that are not clinically significant, why are these findings not clinically significant?" (*Id.*)

As emphasized in the Mendelssohn Report excerpts above, Dr. Mendelssohn noted the absence of "clinical findings" or "functional deficits" as bases for his responses to Sedgwick's first three questions as well as for his "Rationale." Notably, the PCE provided just such functional deficits and clinical findings from Dr. Kommos; however, Sedgwick did not initially provide the PCE to Dr. Mendelssohn. (AR000273.) Apparently recognizing its omission after receiving the Mendelssohn Report, Sedgwick provided the PCE to Dr.

Andrews and asked him whether the PCE would change the opinions in the Mendelssohn Report.[19] (AR000291.) Dr. Andrews opinion was that the PCE did not alter Dr. Mendelssohn's opinions. *Infra* FINDINGS OF FACT, Part VI.C.1.c. However, Dr. Andrews did not respond to each of the questions posed to Dr. Mendelssohn, and it does not appear that Dr. Andrews had the complete available record of Plaintiff's medical history. (*Id.*) Finally, the Court notes that Sedgwick did not ask Dr. Mendelssohn whether Plaintiff had improved since she was found to qualify for STD and LTD benefits.

### b. Jamie Lee Lewis, M.D. ("Dr. Lewis")

In her three-page memorandum dated February 24, 2011, Dr. Lewis submitted the following "rationale" for her conclusion that Plaintiff was not "disabled" (the "Lewis Report"):

> The medical documentation identifies the patient has been under the care of multiple physicians for treatment of low back pain. She ultimately underwent lumbar fusion in May 2010, but continued to report subjective pain postoperatively. Orthopedics reviewed postoperative imaging and found them to be satisfactory and no clinically significant stenosis. The neurologic examination has not demonstrated focal deficits. Participation in [FCE] was most notable for limited effort suggesting that this test does not reflect the patient's maximum musculoskeletal capabilities, but simply what the patient was willing to demonstrate on the date of examination which was below physiologic expectations and consistent with underlying pathology. From a pain medicine perspective, the medical documentation

does not identify a process that would render the claimant unable to perform her usual occupation or support that the performance of her usual occupation would render the claimant at risk of objectively measurable exacerbation of underlying pathology or undue levels of pain for the dates in question.

(AR000280 (emphasis added).)

Sedgwick asked Dr. Lewis to respond to the same five questions that it asked Dr. Mendelssohn. Dr. Lewis gave conclusory, qualified, single-sentence responses to the first four questions. (AR000279 (responding to the first question: "The patient is not disabled from her usual occupation from 12/03/10 through return to work from a pain management perspective."); *id.* (responding to the second question: "Not applicable. That patient is not disabled."); *id.* (responding to the third question: "The clinical findings include a surgical report documenting fusion in May 2010 with postoperative notation of intact neurologic examination."); *id.* (responding to the fourth question: "The patient is not disabled.").) In response to the fifth question, "If there are findings that are not clinically significant, why are these findings not clinically significant?", Dr. Lewis wrote:

> No neurologic deficits were identified in strength, although pain management identified dysesthesias that did not follow dermatomal distribution. Orthopedic evaluation did not demonstrate any significant neurologic deficits. Functional capacity evaluation demonstrated evidence of reduced effort. This was identified in both grip strength and rapid exchange grip testing. It is important to note that reduced effort in upper extremity testing is consistent with overall symptom magnification and poor ef-

19. Although the remaining undisclosed medical documents, including the MRI, may have provided the bases for "clinical findings" and "functional deficits" that Dr. Mendelssohn found lacking, Sedgwick chose not to provide such materials to Dr. Mendelssohn or to Drs. Andrews and Lewis.

fort during the testing. The documentation does not identify any physiologic reason for there to be reduced strength or functional impairment of the upper extremities.

(*Id.*)

On March 9, 2011, Sedgwick obtained a supplemental peer review from Dr. Lewis based on Sedgwick's submission of the PCE (the "Supplemental Report"). (AR000293.) With the PCE, Sedgwick submitted the following question: "Does the additional information [the PCE and related progress notes] alter the original opinion? Please explain." (*Id.*) In her conclusory response, Dr. Lewis wrote:

Additional information does not alter previous opinion.

> **RATIONALE:** Additional information does not provide additional objective physical examination findings that support the patient would be disable from her regular occupation during the dates in question. Documentation does not identify a significant loss of function that would suggest the patient would be unable to fulfill her job requirements during the dates in question or would be at increased risk of harm or injury from performing job duties during the dates in question.

(*Id.*) Sedgwick never asked Dr. Lewis whether Plaintiff had improved since she was found to qualify for STD and LTD benefits.

### c. William C. Andrews, Jr., M.D. ("Dr. Andrews")

On March 9, 2011, Sedgwick also obtained a peer review from Board Certified Orthopedic Surgeon, William C. Andrews, Jr., M.D. ("Dr. Andrews"), to address whether "additional information" provided by Plaintiff would alter Dr. Mendelssohn's opinion (the "Andrews Report"). (AR000291–292.) The "additional information" was Dr. Kommos' PCE and progress

notes from July 28, 2010. (AR000291.) In the two-page Andrews Report, Dr. Andrews concurred with Dr. Mendelssohn and rejected Dr. Kommos' prognosis that Plaintiff "may be permanently disabled from her current position," but she will be able to work in a "teaching capacity in the Spring of 2011." (AR000285 & 291.)

Like Drs. Lewis, Mendelssohn, and Schuele, Dr. Andrews pointed to Plaintiff's "self-limiting" behavior as grounds to support his opinions. (AR000291.) Dr. Andrew's "rationale" further noted the absence of "complications" in the post-operative period and "clinical findings to support that [Plaintiff] would be incapable of working in her regular job." (*Id.*) Interestingly, Dr. Andrews described Plaintiff's "normal" job as a pharmacist "which requires some walking, standing, bending, and reaching, but does not require significant physical exertion." (*Id.*) The source of this job description by Dr. Andrews is unclear, and it is at odds with Sedgwick's description of the pharmacist position as requiring "*continual* walking and standing; some bending and reaching," without reference to "significant physical exertion." (AR000270 (emphasis added).) Sedgwick did not ask Dr. Andrews whether Plaintiff had improved since she was found to qualify for STD and LTD benefits.

### 2. Sedgwick's Rejection of Plaintiff's First Appeal

In a Letter dated March 10, 2010, Sedgwick advised Plaintiff of its rejection of her First Appeal and affirmance of Sedgwick's termination of LTD benefits as of her "return to work date" of December 3, 2010. (the "Appeal Decision"). (AR000297–300 ("It has been determined that you did not meet the Plan's definition of disability. As such, your claim for [LTD] benefits remains denied for the period from December 3, 2010 to your return to work date.").) Sedgwick quoted the definitions of "dis-

ability" in the SPD as the "Plan provisions" under which the Appeal Decision was based. (AR000297.) The Appeal Decision confirmed that Sedgwick did not consider medical documentation submitted by Plaintiff that was dated prior to May 14, 2010:

> *Medical records dated May 14, 2010 through January 13, 2011* from Cape Canaveral Hospital, Hani El Kommos, M.D., Stanley Golovac, M.D., and W. Chinyanganya, PT were reviewed. After a thorough review of the information provided, the determination has been made to uphold the denial of [sic] as you do not qualify for continuing benefits for the period from December 3, 2010 to your return to work date.

(AR000297 (emphasis added).) Further, the grounds for Sedgwick's denial were limited to the Mendelssohn and Lewis Reports, which were summarized in the Appeal Decision. (AR000298–299.) Sedgwick did not rely on or reference the Schuele Report (which had been one of the primary bases for Sedgwick's Initial Termination Letter) or the Andrews Report. (*Compare id.* (summarizing the Mendelssohn and Lewis Reports), *with* AR000246 (summarizing and relying on the Schuele Report).) Finally, Sedgwick did not discuss whether there had been a change or improvement in Plaintiff's condition since Sedgwick had approved Plaintiff for STD and LTD benefits.

In the Appeal Decision, Sedgwick advised Plaintiff that she may "request a second appeal" by "submitting a written request for review of your denied claim within 90 days after your receipt of this letter." (AR000299.) Sedgwick instructed Plaintiff to "state the reason(s) [she] believes [her] claim was improperly denied." (*Id.*) Sedgwick further advised that Plaintiff "may also submit additional medical or vocational information, and any facts, data, questions or comments [Plaintiff] deem[s] appropriate for [Sedgwick] to give the appeal proper consideration." (*Id.*) Finally, Plaintiff was advised that if her claim for benefits "is denied after the second level appeal," Plaintiff has the right to bring a civil action under ERISA. (*Id.*)

### D. Plaintiff's Second Appeal and the SSA Decision

In correspondence dated May 10, 2011, Plaintiff appealed the Appeal Decision (the "Second Appeal"). (AR000303–305.) In her Second Appeal, Plaintiff complained that Sedgwick's "representatives have never spoken to [Plaintiff's] doctors"[20] and that a Sedgwick representative advised her that "even if [Sedgwick's] representatives made contact with [Plaintiff's] doctors that they still hold the right to ignore what they say and to make their own decision about the status of [Plaintiff's] disability claim."[21] (AR000303.) Plaintiff

---

**20.** The AR indicates the Dr. Scheule attempted to contact Dr. Kommos on one occasion on Monday, December 27, 2010. (AR000241.) Dr. Scheule was advised that Dr. Kommos "was out of the office the entire week." (*Id.*) Three days later, Dr. Scheule issued his report on Thursday, December 30, 2010. (*Id.*) With no reference in the AR to any additional effort to reach Dr. Kommos by Sedgwick itself, the Initial Termination Letter issued on Tuesday, January 4, 2011. (AR000245.) Likewise, before issuing his report on Thursday, February 24, 2011, Dr. Lewis wrote that she left voice mail messages for Dr. Golovac on Monday, February 21,

2011 (at 2:29 p.m.), and on Tuesday, February 22, 2011 (at 1:02 p.m.). Dr. Mendelssohn also documented his two unsuccessful efforts to speak with Dr. Kommos just days before issuing the Mendelssohn Report. (AR000273.) This record and the record of Dr. Brock and Dr. Graham's efforts (*see infra,* note 23), with short turn around times before the report was issued, do not reflect particularly diligent efforts to obtain information directly from Plaintiff's treating physicians.

**21.** ERISA administrators need not give special deference to the opinions of a claimant's treating physician over physician advisors

emphasized that no doctor has cleared her to return to work, and she listed the efforts she was undertaking to seek relief from her pain, including: (1) spinal cortisone injections, (2) aquatic physical therapy, (3) muscle relaxers and pain medications (including the name and dosage of such medications), (4) use of a TENS neurostimulator unit at home, (5) heat and ice therapy, and (6) bed rest. (AR000304–305.) Plaintiff also provided copies of additional medical documentation dating back to March 1998, as well as a copy of "a letter from the Social Security Office for Disability Adjudication and Review stating that they [sic] were fully favorable for the awarding of [sic] Social Security Disability Benefits" (the "SSA Decision"). (AR000303; AR000303–336.)

In the SSA Decision, the Attorney Advisor determined, among other things, that: (1) Plaintiff had a "severe impairment" of "lumbar degenerative disc disease;" (2) Plaintiff has "not engaged in substantial gainful activity since February 25, 2010;" (3) Plaintiff has "the residual functional capacity to perform sedentary work;" and (4) Plaintiff's "medically determinable impairment could reasonably be expected to produce the alleged symptoms, and [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible." (AR000314–15.) In making these determinations, the attorney advisor expressly considered the "self-limitation and lack of physiologic changes" during the FCE. (AR000315.)

### 1. Sedgwick's Additional Medical Reviews

In response to the Second Appeal, Sedgwick provided notice that it would take an extension of 45 days to complete its review of the Second Appeal. (AR000338.) Sedgwick then obtained two additional medical reviews from Board Certified Orthopedic Surgeon John M. Graham, D.O. ("Dr. Graham") and Board Certified Neurologist Charles Brock, M.D. ("Dr. Brock"). (AR000340–343 (the "Graham Report"); AR344–347 (the "Brock Report").) Sedgwick posed the same five questions to Drs. Brock and Graham that it had previously posed to Drs. Mendelssohn and Lewis. But, Sedgwick did not ask Drs. Brock or Graham whether Plaintiff's condition had improved since the time that Sedgwick approved her for STD and LTD benefits.

Unlike Drs. Schuele, Mendelssohn, Andrews, and Lewis, Sedgwick provided Drs. Graham and Brock with medical documentation dated prior to June 3, 2010. (*Compare supra* notes 2 and 3, *with* AR000344 and AR000340 (listing medical documentation provided for review).) Although some of the medical documentation was not available when Sedgwick referred the matter to Drs. Schuele, Mendelssohn, Andrews, and Lewis (AR000306–328 (providing copy of Second Appeal with new medical documentation from March 2, 1998 through March 24, 2006)), much of the medical documentation was previously available (FINDINGS OF FACT, Part II.A.3, at Paragraph (A)(5) (listing all of the treatment notes submitted by Plaintiff and Dr. Kommos in support of STD claim)).

### a. John M. Graham, D.O. ("Dr. Graham")

Dr. Graham reached the same conclusion as Drs. Schuele, Mendelssohn, Lewis, and Andrews, that Plaintiff was not disabled. (AR000340–342 (the "Graham Re-

---

hired by the plan. *Black & Decker Disability Plan*, 538 U.S. at 831–832, 123 S.Ct. 1965. Nonetheless, an ERISA administrator may not arbitrarily ignore or discount the opinions of a treating physician. *Id.* at 834, 123 S.Ct.

1965 (noting that ERISA "administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physicians").

port").) In reaching his concurrence, Dr. Graham had access to the Reports of Drs. Schuele, Lewis, Mendelssohn, and Andrews. (AR000340.) And, even though it appears that Sedgwick provided Dr. Graham with all of the available medical records for Plaintiff (AR000340), in his Report, Dr. Graham referenced only the FCE and the medical records from May 2010 through February 8, 2011. (AR000340–341 (summarizing the FCE, "operative notes" dated May 14, 2010, and office notes dated July 28, 2010, September 2, 2010, December 2, 2010, January 13, 2011, and February 8, 2011).) With respect to Sedgwick's five questions, Dr. Graham provided the following conclusory responses:

**1. Is the employee disabled from her regular job as of 12/03/10 to return to work?**

No, the employee is not disabled from her regular job as of 12/03/10 to return to work.

**2. If disabled, what is/are the disabling diagnoses?**

N/A as the employee is not disabled.

**3. What are the clinical findings contained in the medical record and how would these findings impact the employee's ability to function in her regular unrestricted occupation?**

The patient is noted to be s/p 2–level lumbar fusion in May 2010 with ongoing pain complaints. FCE noted inconclusive findings due to inconsistent effort. X-rays were said to reveal solid fusion. The patient also had no neurological deficits noted on physical examination. Therefore, these findings would not impact the employee's ability to function in her regular unrestricted occupation.

**4. If not disabled, what is the expected/appropriate length of disability?**

N/A as the employee is not disabled.

**5. If there are findings that are not clinically significant, why are these findings not clinically significant?**

No *neurological* deficits found on exam. (*Id.*) Finally, Dr. Graham provided the following as the brief "rationale" for his conclusions:

This female has undergone 2 lumbar fusion surgeries, the most recent in May 2010 which resulted in a 2–level fusion of the lumbar spine. The patient has been treated with conservative treatment of physical therapy, medications, and epidural steroid injections but has ongoing pain complaints of low back and lower extremity pain. Serial x-rays are said to reveal good healing of the fusion. On the physical examination, no neurological deficits were noted. Therefore, *from an orthopedic surgical perspective,* the medical documentation provided does not support that this patient is unable to perform her regular job duties as of 12/03/10.

(AR000342 (emphasis added).)

**b. Charles Brock, M.D. ("Dr. Brock")**

Dr. Brock was the only physician engaged by Sedgwick who opined that Plaintiff was disabled. (AR000344–347 (the "Brock Report").) Unlike every other physician advisor engaged by Sedgwick, Dr. Brock was provided with and explicitly referenced all of Plaintiff's medical records dating back to 1998.[22] (AR000344–345.) Dr. Brock also is the only physician advisor to acknowledge Dr. Kommos' repeated

---

22. Absent the complete medical records, the physician advisors would not be able to note that Plaintiff's worsening condition following her second surgery was consistent with the history of her pathology.

statements that Plaintiff may be "permanently disabled" from her current position, and may be unable to work for at least a year after her May 14, 2010 surgery. (AR000345.) In response to Sedgwick's five questions, Dr. Brock responded as follows:

1. **Is the employee disabled from her regular job as of 12/03/10 to return to work?**

From a pain management perspective the employee is disabled from her regular job as of 12/03/10 through 04/08/11.

2. **If disabled, what is/are the disabling diagnoses?**

The disabling diagnosis is history of multilevel lumbar fusion involving the lumbar spine with persistent back pain. Rationale or basis for disability is having undergone the surgeries to remit the persistent back pain with ongoing treatment for pain.

3. **What are the clinical findings contained in the medical record and how would these findings impact the employee's ability to function in her regular unrestricted occupation?**

The available medical records support the patient has persistent pain being described in relation to her condition. She is described as being neurologically intact. She is noted to have had extensive lumbar back surgery with multilevel fusion. Her job requires continual walking and standing. It is the presence of the fusion with persistent pain that support ability to work only at a sedentary level.

4. **If not disabled, what is the expected/appropriate length of disability?**

Reevaluation is recommended in 60 days from the 2/08/11 evaluation to see if pain has substantially improved. The appropriate length of disability is as of 12/03/10 through 04/08/11.

5. **If there are findings that are not clinically significant, why are these findings not clinically significant?**

This is not applicable.

(AR000346.) Finally, the "rationale" provided by Dr. Brock is as follows:

Again, the medical records provided for review indicate multilevel lumbar fusion with persistent pain. [Plaintiff] has persistent pain despite medication, physical therapy, interventions and surgery. [Plaintiff] continues to be treated for pain and is being considered for a spinal stimulator. The presence of persistent pain, despite all the treatment with the noted extensive degenerative disease and postsurgical changes supports the restriction of no greater than sedentary ability. The findings of the degenerative disc disease and postsurgical changes are consistent with restrictions in ability to lift, push, pull, carry, sit, stand and walk. [Plaintiff's] condition is consistent with restrictions in ability to lift, push, pull, carry, sit, stand, and walk. Her condition is consistent with the ability to perform a sedentary job only.

(AR000346.)

### 2. Sedgwick's Final Benefits Determination

In a letter dated July 28, 2011, Sedgwick advised Plaintiff of its final benefits determination in which it reversed its prior decision in part (the "Final Benefits Determination"). (AR000351–354.) As it did in the Initial Termination Letter and the Appeal Decision, Sedgwick again quoted the definition of "disability" as the SPD provision on which Sedgwick's decision was based. (AR000352–353.) But in contrast to its prior decisions, Sedgwick made almost no reference to the opinion of any of its "physician advisors." The Final Benefits Determination provided only cursory

references to the Brock and Graham Reports, and it included no reference at all to the Schuele Report (which Sedgwick relied on for the Initial Termination Letter) and the Mendelssohn and Lewis Reports (which Sedgwick extensively relied on for its Appeal Decision). (*Id.*) Sedgwick also made no reference to the FCE or to any opinion of Plaintiff's treating physicians.[23] (*Id.*) Indeed, the Final Benefits Determination is written in a most repetitive and conclusory manner, and relies almost entirely on the Plaintiff's purported refusal to submit additional medical records as the basis for discontinuing benefits effective April 8, 2011. Specifically, the Final Benefits Determination provides:

> Based on our review of the information provided, it has been concluded that the documentation partially supports that you remain precluded from performing your own occupation as Pharmacist. As such, we have made a determination to overturn the previous claim in part. Your claim has been reinstated from December 3, 2010 through April 8, 2011. However, benefits from April 9, 2011 to your return to work date remain denied as *there is insufficient medical documentation to determine your continued eligibility for benefits.*
>
> The independent physician advisor recommended you undergo reevaluation sixty days from February 8, 2011, to determine if your pain has substantially improved.

Medical records dated March 2, 1998 through March 9, 2011 ... were reviewed.

To afford you every opportunity available, your file was referred to independent physician advisors [Drs. Graham and Brock] for review.

\* \* \*

The medical information, [sic] reviewed revealed a disabling diagnosis of multilevel lumbar fusion involving the lumbar spine with persistent back pain. You have undergone surgeries to remit the persistent back pain. Your occupation as a Pharmacist requires continual walking and standing and the medical information reviewed supports your ability to perform only sedentary level work until your status is reevaluated to determine if you have increased work capacity as of April 9, 2011. *You were offered an opportunity to submit additional medical information for review on Appeal. You declined and advised that you would not be submitting any additional medical information on your second level of Appeal review.*

After a thorough review of the information provided, the determination has been made to partially uphold the denial of benefits. *There is insufficient medical documentation to determine if you remain eligible for continued benefit consideration beyond April 8, 2011.*

\* \* \*

23. The AR indicates that Sedgwick's "independent" physician advisors made minimal attempts to contact Plaintiff's treating physicians. For instance, in his report, Dr. Brock wrote that he attempted to phone Dr. Golovac at 4:30 p.m. on Thursday, June 30, 2011, and at 11:20 a.m. on Friday, July 1, 2011 (before the Fourth of July holiday weekend). (AR000344.) Dr. Brock wrote that he "requested a call back within 24 hours," and advised that he would issue his report if a call back was not received. (*Id.*) Like Dr. Brock, Dr. Graham indicated that he attempted to contact Dr. Kommos on the Friday before the Fourth of July weekend (at 4:50 p.m.), on Tuesday, July 5, 2011 and on the day Dr. Graham issued his report, July 7, 2011. (AR000340.) Also like Dr. Brock, Dr. Graham advised that he would complete his report if his calls were not returned within 24 hours. (*Id.*) Further, there is no indication in the AR that any representative of Sedgwick (aside from the independent physician advisors) ever attempted to confer with Plaintiff's treating physicians.

It has been determined that the submitted medical documentation supports your inability to perform your essential job duties from December 3, 2010 through April 8, 2011. However, we are upholding the denial from April 9, 2011 to your return to work date.

You have a right to bring a civil action under [ERISA] ..., if your claim for benefits is denied after the second level appeal is denied.

(AR000351–53 (emphasis added).)

The record does not support Sedgwick's assertion that it "offered" Plaintiff an opportunity to submit additional medical information for review on appeal related to her entitlement to benefits after April 8, 2011. The Appeal Decision is the only place that the Court could locate in the record where Sedgwick formally advised Plaintiff that she may submit additional documentation on appeal. (AR000299 (advising that Plaintiff "may also submit additional medical or vocational information, and any facts, data, questions or comments [Plaintiff] deem[s] appropriate for [Sedgwick] to give the appeal proper consideration").) However, that notice was in relation to an appeal of Sedgwick's affirmance of its decision in the Initial Termination Letter that Plaintiff's disability ceased as of December, 3, 2010.[24] No where in the record did Sedgwick advise Plaintiff that it was going to consider a date for termination of her LTD benefits that was more than four months after the date it had advised Plaintiff that her LTD benefits had ceased. Plaintiff's Second Appeal related to the December 3, 2010 termination

date, which was the date Sedgwick selected and communicated to Plaintiff in its Initial Termination Letter and in its Appeal Decision.

Upon inquiry during the bench trial, Defendants counsel argued that the notes of a phone call on May 18, 2011, indicate that Sedgwick did advise Plaintiff of an obligation to submit additional documentation. (AR000119.) The Court's review of the May 18 notes does not reflect notice to Plaintiff that her claim would be finally denied for lack of medical documentation as of April 8, 2011. Indeed, as Plaintiff's counsel noted, the change of dates was based on the Brock Report which issued on almost two months after the May 18, 2011 phone call. (AR000344.) Thus, the Court will not infer fair notice to Plaintiff based on the notes of the May 18, 2011 telephone conversation between Plaintiff and Sedgwick that a new date for termination of benefits was being selected by Sedgewick. Rather, the AR shows that Plaintiff had initiated the Second Appeal with reference to a December 3, 2010 termination date for her LTD benefits. Accordingly, the Court finds that, before the Final Benefits Determination, Sedgwick did not provide Plaintiff with fair notice that she was required to submit medical documentation to negate a finding that her condition was so improved by April 9, 2011 that she no longer qualified as "disabled" under the SPD.

### E. Plaintiff's Request for Review of the Final Benefits Determination

After Plaintiff received the Final Benefits Determination, she phoned Sedgwick and asked "if she would be able to submit

24. The only other correspondence from Sedgwick to Plaintiff between the Appeal Decision and the Final Benefits Determination was correspondence dated June 24, 2011 concerning Sedgwick's extension of its deadline to resolve Plaintiff's appeal. (AR000338.) In that correspondence, Sedgwick did not offer Plaintiff an opportunity to submit additional medical information for review on appeal, nor did it advise that her claim would be finally denied if she failed to submit medical documentation to negate an improvement to her condition as of April 2011.

additional medical [information] to support her continued disability beyond [April 8, 2011]." (AR000109–110.) Sedgwick advised that she could not submit additional information, and she would have to "file a lawsuit" to "pursue further benefits under the LTD plan." (*Id.*) Plaintiff then engaged an attorney, who sent Sedgwick correspondence dated October 6, 2011, requesting a review of the Final Benefits Determination and an opportunity to submit additional information and documents. (AR000362–369; Doc. No. 53, Part IX, ¶ 32.) Sedgwick rejected Plaintiff's requests (AR000371; Doc. No. 53, Part IX, ¶ 33), and Plaintiff filed this action.

CONCLUSIONS OF LAW

**I. Rule 52 of the Federal Rules of Civil Procedure**

■ In this action, Rule 52 of the Federal Rules of Civil Procedure provides the appropriate mechanism for finally resolving Plaintiff's claims. *Tippitt v. Reliance Standard Life Ins. Co.*, 276 Fed.Appx. 912, 914–15 (11th Cir.2008) (reviewing trial court's findings and conclusions under Rule 52(a) in an ERISA action for review of benefits determination); *Walker–Hall v. Am. Int'l Life Assurance Co. of N.Y.*, 788 F.Supp.2d 1355, 1357–58 (M.D.Fla.2011) (using Rule 52 to resolve dispute concerning ERISA benefits); *Herman v. Metro. Life Ins. Co.*, 689 F.Supp.2d 1316, 1320, n. 1 (M.D.Fla.2010) (same). Pursuant to Rule 52, "[i]n an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately . . . . [and judgment] must be entered under Rule 58." FED.R.CIV.P. 52(a)(1). Rule 58 provides that every judgment "must be set out in a separate document." FED.R.CIV.P. 58(a).

**II. Civil Enforcement Claims Under ERISA, 29 U.S.C. § 1132(a)(1)(B)**

■ "ERISA was enacted to promote the interests of employees and their bene-ficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). To this end, ERISA regulates "the manner in which plans process benefits claims." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Under ERISA, before denying a claim, a plan has "the responsibility to fully investigate" such claim. *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1199–1200 (11th Cir.2010) (quoting 29 U.S.C. § 1104(a)(1) and reversing summary judgment for plan where denial of benefits after inadequate investigation was *de novo* wrong). In addition, ERISA plans must " 'provide adequate notice in writing to any participator or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant.' " *Black & Decker Disability Plan*, 538 U.S. at 830, 123 S.Ct. 1965 (quoting 29 U.S.C. § 1133(1)). Plan procedures also must " 'afford a reasonable opportunity . . . for a full and fair review' of dispositions adverse to the claimant." *Id.* at 830–31, 123 S.Ct. 1965 (quoting 29 U.S.C. § 1133(2)).

■ Pursuant to Section 1132(a)(1)(B), a beneficiary of an ERISA plan may bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In bringing a Section 1132(a)(1)(B) action, the plaintiff has the burden to prove her entitlement to benefits under the plan at issue. *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir.2008); *e.g., Capone*, 592 F.3d at 1199. And, with respect to this issue, the court is limited to the record presented to the ERISA decision-maker. *Harvey v. Standard Ins. Co.*, 503 Fed.

Appx. 845, 847–48 (11th Cir.2013); *e.g., Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989).

### III. The *Williams* Steps for Review of ERISA Claims

ERISA does not articulate a specific standard by which federal courts are to evaluate a plaintiff's challenge to a plan administrator's benefits determination under Section 1132(a)(1)(B). Absent a statutory standard, the Eleventh Circuit Court of Appeals in *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132 (11th Cir. 2004), established a sequential, individualized, six-step process of review based on guidance from the Supreme Court in *Firestone Tire & Rubber Co.* and *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). *Williams*, 373 F.3d at 1137, *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir.2008). In resolving the Plaintiff's claims, this Court is bound to follow the *Williams* steps (as modified by *Metro. Life Ins.* and *Capone*). *Capone*, 592 F.3d at 1195–96 (noting that the Supreme Court's decision in *Metro Life Ins.*, partially overruled Eleventh Circuit's case law, including *Williams*, concerning application of step six of the process); *Harvey v. Standard Ins. Co.*, 503 Fed.Appx. 845, 847–48 (11th Cir.2013); *e.g., Doyle*, 542 F.3d 1352.

■ As modified, the six steps of the *Williams* process are as follows. First, the Court determines whether the administrator's denial of benefits was "wrong" under a *de novo* standard of review. *Harvey*, 503 Fed.Appx. at 847–48; *Capone*, 592 F.3d at 1196; *e.g., Metro. Life Ins. Co.*, 554 U.S. at 111, 128 S.Ct. 2343. If the decision was *not* wrong, then the Court's inquiry ends at the first step by affirming the administrator's resolution of the plaintiff's claim. *Harvey*, 503 Fed.Appx. at 847–48. If the administrator's decision was wrong, then the Court proceeds to step two. *Id.*

■ In step two, the Court determines if the administrator "was vested with discretion in reviewing claims" under the plan. *Harvey*, 503 Fed.Appx. at 847–48. If the administrator was not vested with discretion, and the denial of benefits was wrong, then the inquiry ends at the second step with reversal of the administrator's decision. *Capone*, 592 F.3d at 1196–98. If the administrator was vested with discretion under the plan, then the court proceeds to the third step of the process.

■ In step three, the Court must determine whether the administrator's resolution of the plaintiff's claim was "arbitrary and capricious" or "an abuse of discretion." *Harvey*, 503 Fed.Appx. at 847–48; *Jett*, 890 F.2d at 1139 (noting that "arbitrary and capricious" and "abuse of discretion" are used interchangeably in the ERISA context). A decision is an abuse of discretion if no "reasonable grounds" exist in the record to support the decision. *Capone*, 592 F.3d at 1196–98. If the Court finds no reasonable grounds to support the administrator's decision, then the inquiry ends at step three with reversal of the administrator's claim. *Harvey*, 503 Fed.Appx. at 847–48. In contrast, if the Court finds that reasonable grounds exist in the record to support the administrator's decision, then the Court proceeds to step four. *Id.*

■ In step four, the Court must determine whether the administrator "operated under a conflict of interest." *Harvey*, 503 Fed.Appx. at 847–48. The classic example of a conflict of interest occurs where the administrator both evaluates claims and pays benefits under a plan.[25] *Metro. Life*

---

25. A sponsor may eliminate conflict issues by "establishing a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits." *Gilley*, 490 F.3d at 856–57

*Ins. Co.,* 554 U.S. at 112, 128 S.Ct. 2343; *Gilley v. Monsanto Co., Inc.,* 490 F.3d 848, 856–57 (11th Cir.2007) (explaining that a conflict exists when "benefits are paid from a provider's assets, so that benefit decisions have a direct and immediate impact on the provider's profit margin"); *Buce v. Allianz Life Ins. Co.,* 247 F.3d 1133, 1141 (11th Cir.2001) (holding that a conflict of interest existed where administrator was "dependent on the patronage" of the plan sponsor who paid benefits from its own funds and reserved "ultimate authority" to resolve claims); *Scarpulla v. Bayer Corp. Disability Plan,* 514 F.Supp.2d 1262, 1273 (N.D.Ala.2007) (holding that a conflict existed even though a third party was hired to administer claims because the employer retained the ultimate ability to "pay out on a claim").

■■■■ Under the fifth step, "if there is no conflict" and the denial of benefits was reasonable, then the Court must end its inquiry and affirm the decision. *Capone,* 592 F.3d at 1195 (quoting *Williams,* 373 F.3d at 1137). If there *is* a conflict of interest, then under the sixth step, the Court must assess the severity of the conflict and consider the conflict as a "factor" that is relevant to determining whether the decision at issue was an abuse of discretion. *Metro. Life Ins. Co.,* 554 U.S. at 117–19, 128 S.Ct. 2343 (approving the "combination of factors method of review" and affirming the appellate court's reversal of district court's judgment for plan and remanding for analysis of what weight to give insurer administrator's conflict of interest); *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Doyle v. Liberty Life Assur. Co. of Boston,* 542 F.3d 1352, 1359–60 (11th Cir.2008).

(citing *Buckley v. Metro. Life,* 115 F.3d 936, 939–40 (11th Cir.1997)); *Turner v. Delta Family-Care Disability & Survivorship Plan,* 291 F.3d 1270, 1273 (11th Cir.2002) (noting that

## A. Under a *De Novo* Review, Sedgwick's Claim Determination Was Wrong (Step One)

■■■■ As noted in the February Order, given the essential duties of a pharmacist, the question at step one of the *Williams* framework is whether Plaintiff has shown under a *de novo* review that she is prevented from continually walking standing, and from bending and lifting as a result of a sickness or injury, and whether Plaintiff was "receiving appropriate care and treatment from a doctor on a continuing basis." (Doc. No. 49 (citing *Capone,* 592 F.3d at 1199–1200 (noting that ERISA plaintiffs bear "the burden of proving a prima facie case of entitlement to contractual benefits" under a plan)).)

The Plaintiff has pointed to ample evidence in the AR to meet her burden. (FINDINGS OF FACT, Part V; Doc. No. 49 at 16–18.) In particular, multiple resonance imaging ("MRI"), x-rays, and surgical procedures have confirmed that Plaintiff suffered from DJD and arthritis since as early as 2004. Since 2004, Plaintiff has had two spinal surgeries that ultimately fused three of her vertebra and left her with only four vertebra. Plaintiff's treating physicians have declined to release her to work and have repeatedly opined that she would be disabled for a year following her surgery and may be permanently disabled from her position as an pharmacist. The SSA has determined that Plaintiff is permanently disabled, and Sedgwick's own reviewing physician (Dr. Brock) determined that the surgeries and "history of multilevel lumbar fusion involving the lumbar spine with persistent back pain" was a sufficient "disabling diagnosis." (AR000346.) The Court agrees. Accord-

any conflict of interest is eradicated by use of a non-reversionary, periodic trust to fund and ERISA plan).

ingly, because Sedgwick's determination that Plaintiff's disability ceased on April 9, 2011 was wrong, the Court must proceed to step two of the ERISA analysis and determine whether Sedgwick "was vested with discretion in reviewing claims." *Harvey,* 503 Fed.Appx. at 847–48.

## B. Defendants Have Not Met Their Burden to Prove that Sedgwick Was Properly Vested with Discretion Pursuant to the Plan Documents (Step Two)

 Under *Firestone* and *Williams,* district courts review an ERISA administrator's claim determinations *de novo,* unless the ERISA plan at issue confers upon the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948. To determine whether discretion is bestowed under an ERISA plan, the Court must review all of the plan documents. *Capone,* 592 F.3d at 1195–96; *Curran v. Kemper Nat'l Servs., Inc.,* No. 04–14097, 2005 WL 894840, at *5 (11th Cir. Mar. 16, 2005) (requiring courts to examine *all* documents that may comprise the plan, including the "trust agreement," annual re-

port, and "summary plan description") (emphasis added).[26] Further, Defendants have the burden to establish that the requisite discretion is conferred under the Plan. *Sharkey v. Ultramar Energy, Ltd.,* 70 F.3d 226, 230 (2d Cir.1995); *Huffstutler v. Goodyear Tire & Rubber Co.,* No. 4:11–CV–3325–VEH, 2012 WL 1424922, at *4 (N.D.Ala. Apr. 20, 2012).

 Here, the issue presented at the bench trial was whether Sedgwick was vested with discretion under the "plan" such that Defendants are entitled to a deferential standard of review. In this regard, the Defendants focused on establishing that the conferral of discretion to Sedgwick under the SPD is effective because the SPD is the only plan document. (*Supra* FINDINGS OF FACT, Parts II.B. and II.C.; Doc. No. 57 at 3–4 (arguing that the "Plan ... unambiguously vests discretionary authority in ... Sedgwick to construe the Plan's terms, to make eligibility determinations, and conduct appeals"); *id.* 15–17 (arguing that the conferral of authority in the SPD is effective because the SPD is the "governing plan document").)[27] Plaintiff counters that under the rules for establishing and amending an ERISA plan, the

---

**26.** Although the Eleventh Circuit has previously found that a summary plan description is part of the plan and sufficient to confer discretion on an administrator, *Curran,* 2005 WL 894840, at *5, such decisions have been called into question by the Supreme Court's recent holding that a summary plan description is *not* the plan, and courts may not give legal effect to provisions in an summary plan description. *CIGNA Corp. v. Amara,* — U.S. ——, 131 S.Ct. 1866, 1877–78, 179 L.Ed.2d 843 (2011) (rejecting the Solicitor General's argument that an ERISA plan "includes the disclosures that constituted summary plan descriptions"). In any event, the pertinent question is not whether the SPD is the only document in existence concerning the plan at issue. Rather, the question is whether Sedgwick was effectively lodged with discretion under the requirements of ERISA. *Shaw v.*

*Conn. Gen. Life Ins.,* 353 F.3d 1276, 1283 (11th Cir.2003); *Kinser v. Plans Admin. Comm. of Citigroup, Inc.,* 488 F.Supp.2d 1369, 1377–78 (M.D.Ga.2007).

**27.** Pointing to an unpublished Order, Defendants contend that this Court previously applied the arbitrary and capricious standard of review to a claim under the same plan at issue in this action. (Doc. No. 57 at 17) (citing *Oates v. Walgreen Co.,* Case No. 8:12–cv–T–33TGW, Doc. No. 33 (Order granting Plaintiff's Motion to Clarify ERISA Scheduling Order).) The *Oates* Order is less than two pages long, it does not identify the ERISA plan at issue, and it does not address any of the arguments asserted in this action. (Doc. No. 40–11.) Accordingly, the Court is not persuaded that the *Oates* Order supports the Defendants' arguments.

SPD simply cannot be effective to confer jurisdiction on Sedgwick. (Doc. No. 58 at 9–16 (citing 29 U.S.C. § 1102 and § 1105).) Upon review of the terms of the SPD, the testimony of the Defendants' witnesses, and the applicable law, the Court agrees with Plaintiff.

ERISA requires that every "employee benefit plan shall be established and maintained pursuant to *a written instrument.*" 29 U.S.C. § 1102(a)(1) (emphasis added). Further, the written "instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *Id.* A "'named fiduciary' means *a fiduciary who is named in the plan instrument,* or who, *pursuant to a procedure specified in the plan,* is identified as a fiduciary ... by a person who is an employer ... with respect to the plan...." 29 U.S.C. § 1 102(a)(2) (emphasis added); *Slomcenski v. Citibank, N.A.,* 432 F.3d 1271, 1278 (11th Cir.2005) (requiring sponsors to follow ERISA plan amendment procedures once such procedures are adopted); *Shaw v. Conn. Gen. Life Ins.,* 353 F.3d 1276, 1283 (11th Cir.2003) (same). ERISA also specifies what must be included in "[e]very benefit plan."[28] 29 U.S.C. § 1102(b). Specifically, every plan shall:

(1) provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter,

(2) describe any procedure under the plan for the allocation of responsibilities for the operation and administration of the plan (including any procedure described in section 1105(c)(1) of this title),

(3) provide a procedure for amending such plan, and for identifying the person who has authority to amend the plan, and

(4) specify the basis on which payments are made to and from the plan.

(*Id.*)

Here, Mr. McGrory clearly testified that the SPD did not "establish" the plan at issue in this litigation, and a review of the SPD reveals that it does not conform to all the requirements of section 1102(b). Accordingly, the SPD cannot be "the plan instrument" by which a fiduciary is named under Section 1102(a). Further, while the SPD does provide a "procedure" for amending the plan (to change or "identify" an administrator or fiduciary for instance),[29] Mr. McGrory's testimony confirmed that the amendment procedure set forth in the SPD was *not followed* when Sedgwick was identified as an administrator under the plan.[30] Specifically, the SPD provides that modifications and amendments to the plan "will be implemented at

---

**28.** In contrast, the minimum requirements for a summary plan description under ERISA include "the name and type of administration of the plan," the "name and address of the administrator ... and any trustee or trustees (if they are persons different from the administrator)," and "the procedures to be followed in presenting claims for benefits under the plan...." 29 U.S.C. § 1022(b).

**29.** Section 1105(c)(1) provides that the "instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities ... among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities ... under the plan."

**30.** The circumstances at issue here are comparable to those in *Shaw,* in which the Eleventh Circuit would not give effect to a grant of discretion in a summary plan description where the plan had not complied with its own procedures for amending the plan. *Shaw,* 353 F.3d at 1282–84 (distinguishing *Buce v. Allianz Life Ins. Co.,* 247 F.3d 1133, 1138–39 (11th Cir.2001) and finding that the district court properly applied a *de novo* standard of review).

the written direction of the Chief Executive Officer of the Company." (*Id.* (emphasis added).) Mr. McGrory did not testify that the SPD was "implemented at the written direction of the Chief Executive Officer of the Company." (*Supra* FINDINGS OF FACT, Parts II.B.) Rather, Mr. McGrory confirmed that the Benefits Department drafted the SPD, he reviewed the SPD, and no one was supposed to sign the SPD. (*Id.*) Accordingly, Sedgwick was not identified as a fiduciary "pursuant to a procedure specified in the plan." 29 U.S.C. § 1102(a)(2). Finally, to the extent Defendants contend that the Service Agreement or Addendum conferred discretion on Sedgwick,[31] there was no testimony that either of those documents was entered "at the written direction of the Chief Executive Officer of the Company."

Because Defendants have not met their burden to establish that Sedgwick was effectively granted discretion under the plan to act as an administrator or fiduciary, and the Court has determined that Sedgwick's decision was *de novo* wrong, the *Williams* inquiry is at an end, and judgment should be entered against Defendants and in favor of Plaintiff. *Harvey*, 503 Fed.Appx. at 847–48; *Capone*, 592 F.3d at 1196; *e.g.*, *Metro. Life Ins. Co.*, 554 U.S. at 111, 128 S.Ct. 2343. Nonetheless, out of an abundance of caution, the Court will consider whether Plaintiff still would prevail on her claim using a deferential standard of review.

### C. Even Under a Deferential Standard of Review, Sedgwick's Claim Determination Was Unreasonable (Step Three)

 Under the third step, the standard of review is the "arbitrary and capricious" or abuse of discretion standard.

*Townsend v. Delta Family–Care Disability & Survivorship Plan*, 295 Fed.Appx. 971, 975–76 (11th Cir.2008). "When conducting a review of ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett*, 890 F.2d at 1139; *Harvey*, 503 Fed.Appx. at 847–48; *Nebesny–Fender v. Am. Airlines, Inc.*, 818 F.Supp.2d 1319, 1331 (S.D.Fla.2011) (citing *Bowman Transp., Inc. v. Ark–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), for the proposition that the arbitrary and capricious standard requires articulation of a "rational connection between the facts found and the choice made"). Generally, the same deferential standard of review applies to both factual findings and conclusions of law. *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir.1997). However, the Eleventh Circuit has explained that factual findings are not arbitrary and capricious if supported by "such evidence as a reasonable person would accept as adequate to support a conclusion," which is more than a "scintilla." *Majali v. U.S. Dep't of Labor*, 294 Fed.Appx. 562, 563 n. 1 (11th Cir.2008).

Courts have recognized a number of actions by an ERISA administrator that indicate the administrator abused its discretion. For instance, the Supreme Court recognized that in an ERISA disability case, an administrator's failure "to provide its independent vocation and medical experts with all of the relevant evidence" is a "serious concern." *Metro. Life Ins. Co.*, 554 U.S. at 118–19, 128 S.Ct. 2343 (affirm-

---

**31.** In fact, at the bench trial, Defendants were adamant that the Service Agreement and the Addendum were *not* plan documents.

ing the appellate court's reversal of the district court's judgment in favor of defendant ERISA plan). In addition, a selective review of evidence to hand pick those portions of treatment notes that support one's decision is not reasonable. *Id.* (agreeing that the administrator abused its discretion when it "emphasized a certain medical report that favored a denial of benefits, [and] deemphasized certain other reports that suggested a contrary conclusion"); *e.g., Kinser v. Plans Admin. Comm. of Citigroup, Inc.,* 488 F.Supp.2d 1369, 1382–83 (M.D.Ga.2007) (rejecting plan administrator's decision that was based on "a selective review of the evidence and reliance on a cold record review by a non-examining doctor"); *e.g., Godfrey v. BellSouth Telecomms., Inc.,* 89 F.3d 755, 758 (11th Cir.1996) (affirming judgment for ERISA plaintiff where the administrator's consulting doctors "arbitrarily rejected" pertinent medical evidence).

 It is unreasonable for an administrator to "arbitrarily" reject clear medical evidence, including the opinions of a treating physician. *Black & Decker Disability Plan,* 538 U.S. at 834, 123 S.Ct. 1965 (noting that ERISA "administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physicians"); *Godfrey,* 89 F.3d at 758–59 (same). In the same vein, an administrator may not wholly ignore a determination by the SSA that a claimant is disabled, particularly where the administrator requires the claimant to seek such benefits to offset any payments from the plan. *Metro. Life Ins. Co.,* 554 U.S. at 118, 128 S.Ct. 2343; *Ray v. Sun Life & Health Ins.*

*Co.,* 443 Fed.Appx. 529, 533 (11th Cir.2011) (noting that an award by the SSA "is not conclusive on whether a claimant" is disabled under an ERISA plan); *Scarpulla,* 514 F.Supp.2d at 1272 (deferring to SSA's comprehensive findings concerning the ERISA plaintiff's medical conditions). Further, an administrator's failure to abide by its own internal claim handling procedures supports the conclusion that the administrator's decision was unreasonable. *Acree v. Hartford Life & Acc. Ins. Co.,* No. 4:12–cv–51, 917 F.Supp.2d 1296, 1320–21 (M.D.Ga.2013)

 Here, the Court finds that Sedgwick's Final Benefits Determination was not based on "such evidence as a reasonable person would accept as adequate to support a conclusion." Indeed, the Court could identify no record evidence that a reasonable person would accept as adequate to support the conclusion that Plaintiff was capable of continuous walking and standing for eight hours a day in December 2010 or in April 2011.[32] Significantly, the Final Benefits Determination makes no reference to the evidence previously relied on by Sedgwick in the Initial Termination Letter and the Appeal Decision (the FCE and the Reports of Drs. Schuele, Mendelssohn and Lewis). And, without explanation, Sedgwick cherry-picked among the opinions offered by Drs. Graham and Brock.[33] While using none of Dr. Graham's opinions, Sedgwick inexplicably dismissed Dr. Brock's recommendation that Plaintiff be reevaluated sixty days from February 8, 2011, while relying on the portion of his opinion that the record substantiates her claim of disability through April 8, 2011.[34] Further, Sedg-

---

**32.** Absent such evidence, Sedgwick's Final Benefits Determination is drafted in a vague, conclusory, and repetitive fashion. (*Supra* Findings of Fact, Part VI.D.2.)

**33.** Sedgwick does not identify Drs. Graham or Brock in the Final Benefits Determination.

Instead, Sedgwick obliquely references "independent physician advisors." (AR000352.)

**34.** The SPD requires that the "reviewer" of an appeal "consult with a health care professional who has appropriate training and expe-

wick made no reference to the SSA Decision or to the extensive and consistent opinions of Plaintiff's treating physicians that she was "incapacitated" and unable to do more than "sedentary" work.

Absent a coherent explanation of Sedgwick's termination of benefits based on the record evidence, in the Final Benefits Determination Sedgwick focused instead on Plaintiff's purported failure to submit sufficient medical documentation to support her claim. (AR000351–53.) This tactic fails because Plaintiff was never provided proper notice that her appeal of Sedgwick's decision to terminate benefits effective December 3, 2010 would also include an appeal of Sedgwick's unannounced decision to reinstate benefits and then terminate the reinstated benefits effective April 9, 2011 (*supra* FINDINGS OF FACT, Part VI. D.2). *Acree*, 917 F.Supp.2d at 1316–19 (noting plan's request for additional information related to ERISA appeal was improperly vague). As to the time period actually referenced in the Initial Termination Letter and the First Appeal (December 3, 2010 and before), Plaintiff submitted ample medical documentation to support her claim (as conceded by Sedgwick when it reinstated her benefits). *Marecek v. BellSouth Telecomms., Inc.*, 49

F.3d 702, 706 (11th Cir.1995) (rejecting defendant's argument that its denial of benefits was proper based on the claimant's failure to present sufficient evidence of his disability where the record included such evidence); *e.g., Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1196–97 (11th Cir.2007) (holding that a denial of LTD benefits based on an absence of "objective" medical evidence was arbitrary and capricious).[35] Plaintiff was given no notice that Sedgwick was considering extending her benefits to April 9, 2011, over four months after the date of termination for such benefits on December 3, 2010, the date which Sedgwick had selected and which Plaintiff had appealed. Thus, Plaintiff had submitted medical information directed to her condition on the date of her benefits termination by Sedgwick, December 3, 1010.[36] Nowhere in the record was she adequately advised that her claim would be denied if she failed to submit medical information on her condition following April 9, 2010, or during the period from December 3, 2010 to April 9, 2011.

Sedgwick's handling of Plaintiff's LTD claim was unreasonable in several additional respects. First, Sedgwick failed to provide Dr. Schuele, Mendelssohn, Lewis

---

rience in the medical field" if Sedgwick's "initial denial was based on a medical judgment." (AR000407.) This requirement is set forth in ERISA regulations as well. *Doyle*, 542 F.3d at 1361 (citing 29 C.F.R. § 2560.503–1)).

**35.** The Eleventh Circuit temporarily vacated the *Oliver* decision pending resolution of a related case. *Oliver v. Coca Cola Co.*, 506 F.3d 1316 (11th Cir.2007). Upon resolution of the related case, the Eleventh Circuit reinstated its opinion holding that the administrator abused its discretion by denying plaintiff's LTD claim based on an absence of "objective" medical evidence. *Oliver v. Coca Cola Co.*, 546 F.3d 1353 (11th Cir.2008) (vacating portion of *Oliver* decision related to the plan's offset rights).

**36.** In closing argument, Defendants' counsel argued that Plaintiff was given notice in a telephone call on May 18, 2011. For the reasons stated *supra*, the Court rejects this argument. Defendants' counsel also argued that Plaintiff's submission of the SSA decision indicates that she understood that she had a continuing obligation to submit disability documentation concerning the periods after December 3, 2010 and April 8, 2011. The Court disagrees. Because of its impact on the issue of Sedgwick's set off rights, Plaintiff was obligated to submit documentation concerning any action by the SSA concerning her disability claim. (*Supra* FINDINGS OF FACT, Part VI.B.) Thus, Plaintiff's submission of the SSA decision does not support the premise that Plaintiff made a decision to withhold pertinent medical documentation from Sedgwick.

and Andrews with "all of the relevant evidence" concerning Plaintiff's LTD claim. (*Supra* FINDINGS OF FACT, Part VI.B.4. (summarizing the Schuele Report and Sedgwick's handling of the same), and Part VI.C.1. (summarizing the Mendelssohn, Lewis, and Andrews Reports and Sedgwick's handling of the same).) Sedgwick's failure in this regard renders the Schuele, Mendelssohn, Lewis, and Andrews Reports unreliable, and it also casts doubt on Sedgwick's independence and impartiality.[37] *Metro. Life Ins. Co.*, 554 U.S. at 118–19, 128 S.Ct. 2343.

Sedgwick also did not abide by the procedures set forth in its Manual. For instance, step fourteen (the "Ongoing Claim Review Process") provides as follows:

> If the medical review indicates there has been *NO* change that has occurred medically and the EE continues to meet all Plan provisions, the LTD CM should:
>
> 1. Schedule a diary for another medical update in 6 months.
>
> 2. Establish a new AP regarding the next update.
>
> 3. Document a rationale statement in JURIS Notes using an "ST" note type the same day following the medical summary documentation. That rationale statement should include the following:
>
> Specific clinical and/or vocational information from JURIS Notes and/or the file regarding why the [employee] continues to meet the provisions found in the Plan. *E.g., still disabled from performing any gainful occupation.*

> The clinical portion should address the [employee's] specific R & L's and/or functional capacity.
>
> The vocational portion can include references to a previous TSA, LMS or roundtable discussions with a JAS.

(AR000447.) As Ms. Craig confirmed, this provision requires that, once a claimant is found to be disabled, peer review medical doctors should be asked if the claimants' medical condition has improved before a determination is made that the claimant is not disabled. Here, Sedgwick did not ask any of the physicians advisors whether Plaintiff's medical condition had improved from the time she was determined to be disabled. And, Sedgwick did not address this issue in its Initial Termination Letter, the Appeal Decision, or the Final Benefits Determination. This departure from Sedgwick's own claim handling procedure was unreasonable.

Given Sedgwick's unreasonable claims handling and the absence of evidence supporting its decision to terminate Plaintiff's LTD benefits in April of 2011, the Court finds that Sedgwick was wrong even under a deferential standard of review. Accordingly, Plaintiff should prevail at *Williams'* third step. Accordingly, Court must remand Plaintiff's claim to the administrator for full development of the record and evaluation of Plaintiff's claim for LTD benefits after April 8, 2011. *Jett,* 890 F.2d at 1140; *Acree,* 917 F.Supp.2d at 1321–22.

## CONCLUSION

Based on the foregoing, the Court will enter a final judgment for Plaintiff and

---

**37.** Although Sedgwick did not rely on the unreliable Reports in its Final Benefits Determination, in this action the Defendants have attempted to rely on those opinions as a "reasonable ground" for Sedgwick's decision. (Doc. Nos. 40, 57.) Accordingly, it is appropriate to consider the reasonableness of Sedgwick's actions in obtaining these opinions. *Tippitt v. Reliance Standard Life Ins.*, 276 Fed. Appx. 912, (11th Cir.2008) (holding that a court may consider and give little weight to an administrator's "self-serving, post-hoc explanations" for its benefits determinations).

against Defendants in accordance with Rule 58(a) of the Federal Rules of Civil Procedure. The parties are directed to consult and agree to a final judgment which: (1) provides that Plaintiff is entitled to an award of her reasonable attorney fees and costs incurred in this action; and (2) remands Plaintiff's claim to Sedgwick for further action to address Plaintiff's entitlement to additional LTD benefits. The parties shall submit the agreed proposed final judgment on or before May 3, 2013. Within fourteen days after the Court enters final judgment, Plaintiff shall file a Motion for Attorney's Fees pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure.